# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## American Oil Company v. Robert A. Lovelace.

### May 24, 1928.

1. Contracts—*Filling Station—Action for Breach of Contract by Oil Company to Furnish Lessee of Filling Stations with Fixtures, Oil, etc.— Title to Fixtures Placed on Premises by Oil Company—Case at Bar.—* In the instant case plaintiff was lessee of a lot on which he intended to build a filling station. The lease was non-assignable. Plaintiff entered into a contract with defendant, an oil company, under which the oil company undertook to furnish plaintiff certain fixtures and plaintiff undertook to buy oil from the company. This agreement defendant refused to carry out because plaintiff could not obtain release from his lessor of lessor's rights to the fixtures, should the lease be forfeited. There was nothing in the contract between the parties which dealt with title to the fixtures, though defendant claimed that it understood that the equipment was to be furnished upon the "prevailing system" and that by the "prevailing system" both parties understood that the waiver of the landlord was to be secured so that the equipment might be removed independent of any claim which the landlord might have against the plaintiff. There was evidence in support of this proposition, but there was nothing in the record to show that any definite agreement to this effect was in force. The jury found that no such agreement existed, and its finding was approved by the trial judge.

   *Held:* That this finding could not be set aside on appeal.

2. Contracts—*Signature—Contract between Proprietor of Filling Station and Oil Company.*—In the instant case defendant oil company entered into a contract with plaintiff, the proprietor of a proposed filling station, to furnish the filling station with fixtures and equipment, and contended that plaintiff had agreed to secure from his landlord a waiver of the landlord's claims against fixtures to be placed by defendant upon the premises of the filling station. The contract between the parties contained no such provision, but a later contract contained such provision. This last contract, however, was not signed by the oil company, though it purported to be executed by it and one G., who seems to have signed the contract as a witness and had no authority to sign it in any other capacity.

   *Held:* That the later contract could not bind plaintiff because it had

not been signed by the oil company and until so signed could not bind him.

3. CONTRACTS—*Filling Station—Action for Breach of Contract by Oil Company to Furnish Lessee of Filling Station with Fixtures, Oil, etc.— Case at Bar.*—In the instant case plaintiff was lessee of a lot on which he intended to build a filling station. The lease was non-assignable. Plaintiff entered into a contract with defendant, an oil company, under which the oil company undertook to furnish plaintiff certain fixtures and plaintiff undertook to buy oil from the company. This agreement defendant refused to carry out because plaintiff could not obtain releases from his lessor of lessor's rights to the fixtures, should the lease be forfeited. There was no provision in the contract that plaintiff should obtain such releases. Under these circumstances plaintiff abandoned his work and his lease, which was soon thereafter forfeited.

   *Held:* That this action on the part of defendant constituted a breach of contract for which defendant must respond in damages.

4. CONTRACTS—*Damages—Refusal of Oil Company to Furnish Proprietor of Filling Station with Equipment and Oil as Provided by its Contract— Case at Bar.*—In the instant case plaintiff, the proprietor of a proposed filling station, entered into a contract with the defendant, an oil company, to furnish equipment, oil and gas for the filling station. Defendant breached this contract and plaintiff abandoned the enterprise. In an action for damages by plaintiff against defendant, work done on the proposed filling station by plaintiff before his contract with defendant was executed was done at his own risk and did not constitute an element of damage in the present action, but work done after the execution of that definite contract could fairly be assumed to have been done in furtherance thereof, the contract was not the remote but the proximate occasion thereof, and plaintiff was entitled to recover for such work.

5. CONTRACTS—*Damages—Refusal of Oil Company to Furnish Proprietor of Filling Station with Equipment and Oil as Provided by its Contract.— Proprietor's Loss of Wages as an Element of Damage—Case at Bar.*—In the instant case plaintiff, a proprietor of a filling station, entered into a contract with defendant, an oil company, under which defendant was to furnish plaintiff with equipment, oil and gas and to pay plaintiff a salary of $50.00 a month. Defendant breached this contract and plaintiff brought his action for damages. Plaintiff claimed as an element of damages his loss of wages. Plaintiff claimed that he could have secured work in the line of his profession at from $250.00 to $350.00 a month in other cities, and that he did actually secure work at $82.50 a month in his home town. He assigned as his reason for not accepting a position in another city that he desired to stay with the present litigation.

*Held:* That plaintiff's reason was not adequate and he could recover nothing by way of loss of salary.

6. Contracts—*Damages—Refusal of Oil Company to Furnish Proprietor of Filling Station with Equipment and Oil as Provided by its Contract— Value of Plaintiff's Lease—Case at Bar.*—In the instant case, an action for damages by the proprietor of a proposed filling station against an oil company, the oil company breached its contract with the proprietor to furnish equipment, oil, gas, etc., and thereupon the proprietor abandoned the project and his lease of the premises was forfeited. The proprietor claimed damages for the value of his lease.

*Held:* That while the value of the lease was to be considered in the assessment of damages, as the lease was non-assignable, and the property, except as a place for conducting a filling station was without value, therefore these two elements of damage are to be considered together, and unless the proposed business was profitable, the lease was worthless.

7. Contracts—*Damages—Refusal of Oil Company to Furnish Proprietor of Filling Station with Equipment and Oil as Provided by its Contract— Profits of the Proposed Business—Case at Bar.*—The instant case was an action by the proprietor of a proposed filling station against an oil company for the breach by the oil company of a contract under which the oil company was to furnish plaintiff with equipment, oil, gas, etc. Upon a breach of the contract plaintiff abandoned the enterprise. Plaintiff claimed damages for loss of possible profits from the conduct of the filling station.

*Held:* That any finding of the jury as to possible profits from running the filling station would be guess work and that judgment could not be predicated on conjecture.

8. Damages—*Profits.*—Profits may only be recovered where they can be ascertained with reasonable certainty.

9. Damages—*Profits—Verdict Including Speculative Profits Set Aside.*—In the instant case, an action on a contract, it was clear from a verdict for plaintiff that certain speculative profits must have been considered by the jury. The court set aside the verdict as to the damages and impanelled a jury to inquire into the question of the amount of the damages only.

*Held:* That the action of the court was plainly right.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by motion for judgment for

money.   Judgment for the plaintiff.   Defendant assigns error.

*Judgment modified and affirmed.*

The opinion states the case.

*W. R. L. Taylor*, for the plaintiff in error.

*L. S. Parsons*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

The plaintiff below, Captain Robert A. Lovelace, was in 1924 chief of police for the Norfolk army base. For satisfactory reasons he decided to go into the business of selling gasoline, etc., and in furtherance of that purpose resigned from the police force. With this in view and on September 1, 1924, he leased from one Chas. H. Swink a vacant lot located in Norfolk at the intersection of Hampton boulevard and Sewalls Point road. That lease was for ten years at an annual rental of $225.00. Lovelace on his part further agreed to erect thereon within ninety days a filling station, etc., at his costs. The lease was non-assignable and had in it the provision that it might be forfeited at the option of the grantor should the grantee fail to perform any of the duties which it imposed upon him. Under the power thus given the lessor, Swink, on March 10, 1925, did declare the lease forfeited. The legality of this act is not challenged and so on that date Lovelace's interest in the leased premises terminated.

More than one oil company was willing to enter into a contract with Lovelace for the sale of its products. Out of these possibilities he selected the defendant. Negotiations were in a tentative way begun even before

the contract of lease from Swink was actually signed and progressed uninterruptedly until they ripened into· the contract of December 4th, here copied:

"This agreement, made this 4th day of December, · nineteen hundred and twenty-four, by and between: The American Oil Company, of the first part, and Robert A. Lovelace, party of the second part.

"Witnesseth, That whereas the party of the second. part holds a leasehold interest in the premises located in the city of Norfolk at the intersection of Hampton boulevard and the old Sewalls Point road; and whereas, the party of the first part, being distributors of petro-· leum and its products, desires that the said Robert A. Lovelace shall handle its products; whereas, in order to· consummate this agreement it is necessary that The· American Oil Company furnish the equipment herein-· after referred to. Now, therefore, this agreement. witnesseth, that in consideration of the premises and. the mutual covenants herein contained, The American Oil Company agrees: (1) To lease, for the term of this agreement, the following described equipment: One· 1,000-gallon tank, one cut 204-V pumps and parts necessary to store and dispense American strate gaso-· line and lubricating oils. (2) To sell the following· described equipment: One 1,000-gallon tank, one cut. 204-V pumps and parts necessary to store and sell Amoco-Gas at and for the price of five hundred and eighty-five dollars each outfit upon an agreement whereby said Robert A. Lovelace will agree to. pay· upon the installation $25.00 cash on each pump and that he shall pay in addition one cent per gallon on all Amoco-Gas purchased from The American Oil Company until the full sum of $585.00 shall have been paid, and that at no time shall he purchase less than 2,000· gallons per month. (3) To deliver all products main-·

tained or handled by The American Oil Company for cash at the prevailing market price at the time of delivery. (4) To pay as salary to Robert A. Lovelace the sum of $50.00 per month on the first day of each month, said payment to be made to T. A. Baine as trustee of Robert A. Lovelace. (5) To pay to install all equipment herein referred to at its own expense. (6) To, from time to time and in such manner as in its discretion may seem proper, circularize the trade, or use any other advertising facilities. Robert A. Lovelace agrees: (1) To well, truly and faithfully carry out the provisions of this agreement and to at all times use his best efforts for the sale and to promote the sale of the products of The American Oil Company. (2) To pay for all products covered by this agreement upon delivery. (3) To buy and handle the products of The American Oil Company exclusively, and not to handle any gasoline, motor fuel, motor fuel ingredients, lubricating oils, etc., of any other person, firm or corporation. (4) To use all the equipment herein referred to for the purpose of dispensing the products of The American Oil Company exclusively, and of no other company, firm or corporation. (5) To grant to The American Oil Company the exclusive right to advertise on the premises. (6) That in the event he shall desire to dispose, transfer or assign his premises or business, or any part of it, or shall cease to possess the same interest that he now holds therein, then The American Oil Company shall have the option to purchase the aforesaid business, including lease, at such sum as shall be agreed to between the parties to be a fair and reasonable cost therefor, or in the event they fail to agree, each party shall appoint an arbitrator, and in the event the arbitrators fail to agree, the arbitrators shall appoint an umpire whose decision shall be binding on

all the parties hereto. The parties mutually agree: (1) That neither party shall be responsible for acts or omissions beyond its control. (2) Should any provisions in this contract be declared void or unenforceable by any court under any law now existing, or which may be hereafter passed, then all the remaining covenants shall remain in full force and effect. (3) That this agreement shall continue for a period of two years, beginning with completion of installation and opening of station for gasoline trade, with the right to renew it for a period of three years at the option of The American Oil Company, and a further right to renew it for an additional period of approximately five years (terminating August 31, 1923), at the option of The American Oil Company. (4) It is further agreed that the conditions and covenants herein contained shall bind the parties hereto, the survivor and assigns of the said Robert A. Lovelace or any person or persons by, from or under him. In witness whereof, the said parties have hereunto affixed their hands and seals the day and year first above mentioned. The American Oil Company, by J. Blaustein, first vice-president. Robert A. Lovelace.''

This contract was to run for two years and might be renewed at the option of the defendant. It provided among other things that the defendant was to furnish certain pumps, tanks and other trade fixtures and was to pay Lovelace a salary of $50.00 a month. When the time came to furnish these fixtures some questions arose as to the character of the title to be retained. The oil company did not wish to be divested of any of its rights until it had been fully paid therefor and as a corallary was unwilling that these fixtures should be attached to the freehold in such manner as to carry title to Swink should the lease itself afterwards be

forfeited. Both Lovelace and the oil company sought to obtain a release from Swink and such a release Swink steadfastly refused to give. In these circumstances Lovelace abandoned his work and his lease was, as we have seen, soon thereafter forfeited.

There was nothing in the contract of December 4th which dealt with title to the fixtures, and so on its face it was the duty of the oil company to furnish them and take chances as to title. The defendant claims that it was always understood that this equipment was to be furnished upon the "prevailing system" and that by the "prevailing system" both parties understood that a lease agreement in one case and a conditional sales contract in the other were to be executed and that the waiver of the landlord was to be secured so that the tank and equipment might be removed from the leased premises independent of any claim which the landlord might have against the lessee, Lovelace. There is evidence in support of this proposition. The Lovelace letter of September 26th supports it, and a contract bearing date December 9th is to the same effect.

This last contract was not signed by The American Oil Company, though it purports to have been executed by it and Gerow, who seems to have signed it as a witness, had no authority to sign it in any other capacity. So far as it is signed at all is shown by the following excerpt:

"THE AMERICAN OIL COMPANY

By_____

First V. P. & Gen. Mgr.

Witness_____

Witness   A. H. Gerow

Lessee_____ ...

Robert A. Lovelace."

[1, 2] In other words, there is nothing of record to show that any definite agreement to this effect was in force when the contract of December 4th was executed, while the memorandum of December 9th could not bind Lovelace because it had not been signed by the American Oil Company therein described as lessor and until so signed could not bind the lessee. Lovelace's denial is far from being as clear cut as it might be, but he does deny it and its existence was specifically presented to the jury in instruction No. 6. That jury found that no such agreement existed. Its finding was approved by the trial judge and we cannot disregard it.

[3] This then is the situation so far: The oil company had agreed to furnish Lovelace certain fixtures. This agreement it refused to carry out because Lovelace would not obtain for it releases not provided for in the contract and which he had not undertaken to obtain. This constitutes a breach and for it the defendant must respond in damages.

There were two trials. At the first a verdict for $2,500.00 was returned. This the court was asked to set aside and to enter up judgment for the defendant *non obstante veredicto.* The trial court overruled this motion so far as it related to the merits of the case, but sustained it as to the recovery, being of opinion that certain speculative profit must have been considered by the jury in the ascertainment of its amount.

Afterwards a jury was impanelled and was directed to inquire into the question of damages only. In other words the trial court was of opinion that the defendant had breached its contract and was liable in damages, and at the second trial the only matter which came up for consideration and which was submitted to the jury was the ascertainment of the amount thereof. There was a verdict for $766.80 confirmed by the court.

[4] We have heretofore seen that plaintiff at or before the execution of the lease of September 1st had taken up with the defendant those matters placed in final form in the contract of December 4, 1924. He has testified that work done on this lot between September and December was done in contemplation of this. The trial court held, however, and rightly, that work done before the December contract was signed by the plaintiff was done at his own risk and so ruled and to that ruling no error is assigned; but it also held that work done and material furnished, in amount $266.00, after the execution of that definite contract could fairly be assumed to have been in furtherance of its obligations. In other words, it was of opinion that the contract was the proximate and not the remote occasion thereof. This is a reasonable conclusion and we affirm it.

[5] The next possible element of damages shown at the second trial is loss on account of wages. Lovelace was to receive $50.00 a month. His statement is that he could have gotten work in a number of the larger cities in the line of his profession at from $250.00 to $350.00 a month, and that he did actually secure work in Norfolk in August, 1925, at $82.50 a month.

The reason he gives for not accepting any position in another city was that he desired to stay with this litigation. That reason does not commend itself as being adequate and we are of opinion that he can recover nothing by way of loss of salary.

[6] It only remains for us to consider the matter of profit, and value of the lease. In a case of this character both are factors to be considered in any assessment of damages. Here, however, the lease was non-assignable and so this vacant lot except as a place for conducting this contemplated business was without value. This

might be assumed and it does affirmatively appear from the testimony. Therefore, in the instant case, these two elements of damages are consolidated. Unless the business was profitable, the lease was worthless.

[7] Had the jury any right to consider possible profits? Lovelace was without experience. The location was untried and was in fact only a vacant lot. A witness for the plaintiff and an experienced oil man has testified that in such circumstances it would be impossible to say what the amount of sales would be or what would be the cost of operation. His evidence is to the effect that one could not tell in advance the financial result of the operation of this filling station. It is easily in the bounds of possibility that it would have run at a loss and not at a profit at all. No business runs itself. The fact that one retail grocery is a success would aid us little in ascertaining in advance what the profits of another would be. Any finding of a jury would be guess work and judgment cannot be predicated on conjecture.

[8] Profits may only be recovered where they can be ascertained with reasonable certainty. *Arkla, etc., Co. v. West Virginia Timber Co.*, 146 Va. 641, 132 S. E. 840. This rule was approved by Judge McLemore in *Forbes* v. *Wyatt*, 143 Va. 802-809, 129 S. E. 491.

We are of opinion that on this branch of the case also there can be no recovery.

[9] We have not undertaken to discuss separately the several bills of exception, but have dealt with them as a whole. We have, however, covered all matters which they bring to our attention. To summarize our conclusions, we are of opinion that the plaintiff is entitled to recover $266.00 and interest and no more.

The action of the trial court in setting aside the first verdict was plainly right and is affirmed.

The judgment of the court below is modified to this extent and as modified is affirmed.

*Judgment modified and affirmed.*