# Wytheville

ANNA KRIKORIAN, EXECUTRIX, ETC. v. THOMAS DAILEY.

June 8, 1938.*

Present, Holt, Hudgins, Gregory, Browning, Eggleston
and Spratley, JJ.

*Rehearing refused September 9, 1938.

The opinion states the case.

*David Meade White* and *Harold H. Dervishian,* for the plaintiff in error.

*James W. Gordon, James C. Page* and *J. D. Eggleston, III,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

The plaintiff, Thomas Dailey, is a Syrian, born abroad (his name has probably been changed). The defendant's decedent, K. Der Krikorian, was also a foreigner and an Armenian. He owned property in Richmond known as No. 509 North Ryland street which he leased to the plaintiff in October, 1927. Dailey conducted there a confectionery business and sold candies, soft drinks, tobacco, etc. His lease was renewed by a deed of lease of date July 2, 1935. Under it he held until February 24, 1936, when he was dispossessed for non-payment of rent. The rent was regularly paid up to November 20, 1935.

In April, 1933, Krikorian acquired property known as No. 1039 West Grace street. This adjoins the Ryland street property. On it, and apparently at the intersection of these streets, was a brick residence. From this corner to Dailey's

store was sixty-five or seventy yards. Krikorian desired to utilize his newly acquired property and went to see the Laburnum Realty Corporation. That company, without naming any specific property, advertised that it had properties suitable for drug store locations and referred applicants, who desired a "neighborhood location" as distinguished from a downtown location, to it. About a year later they did lease it to J. W. Chamblee and D. P. Chamblee. This deed of lease is dated July 19, 1935, and was for a term of six years. The lessor agreed to make and did make alterations in this brick residence to fit it for a storeroom at a cost of from $5,000 to $8,000, although their character and cost was not incorporated into the lease. The lessee took possession under this lease on November 1, 1935, and was to pay rent at the rate of $110 per month for the first two years, $120 a month for the next two years and $125 a month for the last two years.

It is Dailey's contention that before the lease of July 2, 1935, was executed, he wished to make sure that any business to be conducted at the Grace street store should not be of a character which actively competed with him and that Krikorian did agree that no confectionery store or drug store should be established there. The parties came to no agreement as to a drug store, but in the lease to Dailey is this covenant: "Lessor will not lease the property known as No. 1039 West Grace street for a confectionery during this lease." This reason for that covenant appears in Dailey's direct examination:

"When we make the new lease ask for protection for my business,—I take a five-year lease I ask for him to give me a protection for five years, you will not put any confectionery at 1039 West Grace. And he agreed to do it. He said, 'Well, suppose I want to put a grocery store in the corner?' I told him, 'No, sir; no objection to a grocery store.' I told him he could put the grocery store. Then he said, 'Suppose a drug store?' I told him, 'No such thing as a drug store any more,—used to be drug store 20 or 35 years ago, but now you can call them drug store, hard-

ware store, or anything. The name don't mean anything.' I told him I couldn't accept that."

Afterwards, when he learned of the proposed lease to the Chamblees for drug store purposes, he protested.

"Q. What did you do when you learned that he was going to lease this premises to some drug store?

"A. Yes, sir; I talked to him on the 'phone,—called him up and talked to him myself. I called him up and talked to him. Talked to Mr. Krikorian and asked him what he was going to build in the corner. He said, he told me, 'Well, maybe grocery store.' I told him, 'Well, if it is a grocery store it is perfectly all right to me.' Then he turned around and said, 'Well, maybe a drug store.' I told him, ''Tain't no such a thing any more.' I told him why he was going to tell me a grocery store and then say a drug store. I told him, 'Well, you know the agreement between me and you for the lease,—the agreement for protection.' The protection he gave me and me and him signed. He said, 'Well, it is all right.' Asked me,—said, 'I have a right to rent my property.'"

In the Chamblee store were sold not only drugs but practically all of those things carried in stock by Dailey, and it is his contention that by reason of this competition his business, which had been continuously prosperous, fell away, so that profits vanished and he was put out for non-payment of rent in February, 1936. His contention was sustained, and he has recovered a verdict of $4,750, which was confirmed by the trial court.

Plaintiff himself wished to rent this Grace street property and made an offer of $90 a month, which was refused, and it was then that he determined to lease again the Ryland street store which he then held. Mr. Richie, who represented the Laburnum Corporation, said that Dailey was anxious to be protected against competition. He was asked: "If you knew that drug stores ordinarily sold such goods as were being sold by Mr. Dailey, then when you came to negotiate as agent for Mr. Krikorian a lease of the 1039 West Grace as a drug store, you knew that that would in-

volve competition with Mr. Dailey, didn't you?" and answered, "We had told Mr. Dailey that we could give him no such protection against competition."

At Dailey's instance, and after prolonged negotiations, the Laburnum Realty Corporation drew up a lease which would have prevented the leasing of the Grace street property to any type of business which would install a soda fountain. This lease Krikorian refused to sign and tore up.

Mrs. Aghavni Ghazarian, a daughter of Krikorian, said: "I heard my father say repeatedly on several occasions that he had made his intentions, that of building a drug store on the corner, perfectly plain to Mr. Dailey before he had started negotiating with him, that he had told Mr. Dailey that he would give him the choice of either staying there or even moving out, that he was going to put a drug store on the corner, and that he was even negotiating such a lease as that of putting a drug store on the corner, and Mr. Dailey, fully aware of this, had chosen to stay there."

This much is fairly clear: Dailey was anxious that no competitive business be established on Grace street and that these restrictions be embodied in the lease to him of the Ryland street property. Krikorian, on his part, was anxious that no restrictions be placed upon him which would fetter its use, but he did agree that no confectionery business should be established there, and that, as we have seen, was written into the Dailey lease.

Has that covenant been violated?

The court in substance was asked to tell the jury as a matter of law that a drug store is not a confectionery. Instruction F, tendered on behalf of the defendant and refused by the court, reads:

"The court instructs the jury that the plaintiff and the defendant's decedent, K. Der Krikorian, entered into an agreement in writing dated July 2, 1935, whereby the said plaintiff agreed to rent the premises, No. 509 North Ryland street, Richmond, Virginia, for the period of five years from the first day of October, 1935, to be used as and for a confectionery, and the said defendant's decedent agreed not

to lease his property known as No. 1039 West Grace street, Richmond, Virginia, for a confectionery during the lease dated July 2, 1935, between the said plaintiff and the defendant's decedent. The court instructs you that a lease for drug store purposes only is not a lease for a confectionery, and if the jury believe from the evidence that the defendant's decedent did by lease dated July 19, 1935, lease his property, No. 1039 West Grace street, to J. W. Chamblee and D. P. Chamblee for drug store purposes only from the first day of November, 1935, for the term of six years, then the defendant's decedent did not violate his covenant not to rent the premises for a confectionery, and the jury must find for the defendant."

In the construction of contracts, these elementary principles are always to be remembered.

■ "Words and phrases should receive primarily that construction which they commonly receive in the ordinary affairs of life." *Kennard* v. *Travelers Protective Association*, 157 Va. 153, 160 S. E. 38, 40.

■ "The province of construction lies wholly within the domain of ambiguity." *Hamilton* v. *Rathbone*, 175 U. S. 414, 20 S. Ct. 155, 158, 44 L. Ed. 219.

■ "Where a written contract is clear and unambiguous on its face, it is the duty of the court to construe it. *Geoghegan Sons & Co.* v. *Arbuckle Bros.*, 139 Va. 92, 123 S. E. 387, 36 A. L. R. 399." *Bossieux* v. *Shapiro*, 154 Va. 255, 153 S. E. 667, 669.

■ All of these rules are to be remembered, and the academic definition of words is often important, but more important still is the purpose of the covenant. Has that purpose been kept or broken?

■ "To ascertain the intent of the parties to a contract, reference must be had to the subject matter, the situation of the parties, their aims, purposes and the circumstances surrounding its execution." Michie's Digest, Vol. II, p. 898, citing many cases.

This brings us back to a consideration of the restrictive covenant in the Dailey lease: "Lessor will not lease the

property known as 1039 West Grace street for a confectionery during this lease."

That this was intended to relieve Dailey from a measure of competition is perfectly plain; otherwise, it would be meaningless. If a confectionery was established in the Grace street store, it has been violated.

■ In Webster's New International Dictionary a confectionery is defined as "a place where confections are made or kept."

■ It is not disputed that confections were kept for sale by the Chamblees. Indeed, it is shown by the record, and it is a matter of common knowledge, that a large part of the business of drug stores today consists of the sale of things other than drugs. Their character has changed within our recollection, and they are no longer merely chemists' shops. From the evidence it appears that the sale of merchandise carried by Dailey and afterwards carried by the Chamblees so cut into the former's business as to reduce him to bankruptcy.

■ The courts should and do look to the substance of things in the construction of contracts. If a landlord owned two storerooms in a building and were to rent one to be used as a delicatessen shop and covenanted that no other delicatessen store was to be established in that building, plainly to permit the establishment of another store, designated by its proprietor as a "Food Shoppe," which carried the same merchandise carried by the delicatessen store, would be a violation of this covenant. Nor would the situation change if in addition other things were sold there.

It must be conceded that the authorities are not in accord on this subject.

In *Mook* v. *Weaver Bros.*, 61 App. D. C. 214, 59 F. (2d) 1028, a room was rented to be used as a delicatessen store, and it was stipulated that no other delicatessen store should be established in that building. Another storeroom there was leased to the Great Atlantic & Pacific Tea Company, which sold those things sold in a delicatessen store and other things in addition. It was held that the Great At-

lantic & Pacific Tea Company was not a delicatessen store and relief was refused. The court said that the implication was that these stores differed in some substantial particular; otherwise the same name would have been applied to each. That case came under review in *Parker* v. *Levin*, 285 Mass. 125, 188 N. E. 502, 90 A. L. R. 1446, and was expressly disapproved, the court holding that there was no virtue in a name.

The facts in *Parker* v. *Levin, supra*, were these (page 503):

"On August 25, 1931, the defendant leased to the plaintiff, for five years beginning September 1, 1931, a store at 1147 Broadway in Somerville, 'to be used for the purpose of operating a delicatessen store such as is now conducted (by the plaintiff) on the premises,' and covenanted 'that no other delicatessen store shall be located on the premises; viz. 1119-1147 Broadway, Somerville.' "

Later the owner did lease another room in that building to the Great Atlantic & Pacific Tea Company to be used as a store "for the purpose of a general merchandise business, including fresh meats, fish, fruits, vegetables, delicatessen, pastry items."

The court was of opinion that the covenant was broken and said: "A delicatessen store, within the meaning of the covenant, is one that sells delicatessen and not merely one that sells nothing else," quoting a number of cases.

And in that case it was held that the question as to whether or not the covenant was broken was a jury question.

And the same conclusion was reached in *Supreme Finance Corp.* v. *Burnee Corp.* (1933), 146 Misc. 374, 262 N. Y. S. 147, and in *Schmukler* v. *Raynes Realty Corp.* (1930), 137 Misc. 320, 242 N. Y. S. 514.

Here, as in these cases, that question was by a proper instruction submitted to the jury.

If the same line of goods was carried in each store, what boots it that the Chamblees sold something in addition? They certainly sold confections.

■ We think the better reasoning supports the conclusions of the Massachusetts court. An elaborate review of the authorities will be found in a note in 90 A. L. R. 1450.

The defendant objected to plaintiff's Instruction A for these reasons:

" * * * first, because the plaintiff testified himself that his wife was a partner in the business, and that the licenses were issued in their joint names. Which evidence cannot be disputed as to the plaintiff. And the court should so instruct the jury and not leave the question to the jury on the facts and circumstances in evidence when the plaintiff himself has testified that he was not the sole owner of the business.

"Second, that the instruction is contrary to the evidence in the case."

■ It is said, and it is of course true, that a plaintiff is bound by his own statements, provided, of course, that they are intelligently made.

■ It is true that Dailey does at times say that he and his wife were partners, but a painstaking examination of his entire testimony leads us to the conclusion that it is doubtful if he understood what was meant by that term, or that he had any conception of the elements which went to make up a partnership. In these circumstances this was a jury question.

The bank account was kept in their joint names. Licenses to do business were issued indiscriminately to Mary Dailey, Thomas Dailey and to Mary and Thomas Dailey.

Dailey could neither read nor write English. The lease was to him, he did the buying, and he paid the rent. The wife had nothing except what he gave her. She worked in the store, but much of her time must have been taken up with domestic affairs, for she had nine children. Abroad, more than with us, husband and wife jointly conduct their business. This grows out of the marital relation and not for any purpose to form what is commonly known as a partnership, and it is entirely possible that they had no idea what was necessary in order to constitute that entity.

The question as to whether or not this was Dailey's business or a partnership business was properly submitted to the jury.

Plaintiff's Instruction 2-A is objected to. It is said that the court should have construed the lease. That instruction merely told the jury that the covenant was broken if a business substantially similar to Dailey's was conducted in the Grace street store.

Objection is made to plaintiff's Instruction 3-A. That instruction reads:

"The court instructs the jury that if you believe from all the evidence in this case that Thos. Dailey was the sole actual owner of the business at 509 North Ryland street, and that the purpose and intent of the provision in question in the lease of July 2, 1935, was to protect the plaintiff from competition by a substantially similar business and that Krikorian knew, or in the exercise of ordinary care should have known, that Chamblee would sell in his drug store such articles and goods as were sold by the plaintiff and thereby engage in substantial competition with the plaintiff and that nevertheless Krikorian rented the premises 1039 West Grace street to Chamblee for drug store purposes and thereby caused or permitted Chamblee to enter into substantial competition with the plaintiff, and that said Chamblee in the conduct of his business did enter into substantial competition with plaintiff and that by reason of such competition the plaintiff's business was injured, then the jury should find for the plaintiff and assess his damages at such an amount as they believe from the evidence will reasonably compensate him for the loss which he sustained as the natural, direct and proximate result of such competition."

Matters therein dealt with have already been considered with this exception: Defendant contends that the damages suffered, if any, are too remote, speculative or uncertain to justify a recovery. Plaintiff's claim is for profits which might have been reaped and were not.

■ "Profits may only be recovered where they can be ascertained with reasonable certainty. *Arkla, etc., Co.* v. *West Va. Timber Co.*, 146 Va. 641, 132 S. E. 840. This rule was approved by Judge McLemore in *Forbes* v. *Wyatt*, 143 Va. 802-809, 129 S. E. 491." *American Oil Co.* v. *Lovelace*, 150 Va. 624, 143 S. E. 293, 296.

■ The leading case on this subject is *Hadley* v. *Baxendale*, 9 Exch. 341, 23 L. J. Exch. 179, 18 Jur. 358, 5 Eng. Rul. Cas. 502. It was there held that damages recoverable for breach of contract are such as fairly, reasonably and naturally arise in the ordinary course of things from such breach.

This was followed in *Manss-Owens Co.* v. *Owens & Son*, 129 Va. 183, 105 S. E. 543. The Manss-Owens Company appointed Owens & Son its agent to sell shoes in a certain territory. This contract the shoe company broke. Owens & Son were permitted to recover prospective profits. The basis of their recovery was past experience in selling shoes. in that territory. The court said (page 550):

"Under our view of the case, the plaintiffs were clearly entitled to recover the value of their contract. The only practical way to determine this value was to introduce evidence as to the probable amount of sales which they would have made if they had been allowed to perform their contract, and the best way to make an intelligent estimate of this value was to consider the extent of the territory and the past experience of the plaintiffs in selling goods of a similar character in that territory."

Judge Prentis gives these compelling reasons for his conclusions:

" * * * Such damages, however, are nearly always involved in some uncertainty and contingency, and can be determined only approximately upon reasonable conjectures and probable estimates. If they are so uncertain, contingent and imaginary as to be incapable of adequate proof, then they cannot be recovered. When, however, it is certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been

damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty. The violator of his contract should not be allowed to escape all liability simply because the precise amount of the damages for which he is responsbile is uncertain. Nearly all comercial contracts are entered into in contemplation of future profits. As such profits are prospective, they must be uncertain and problematical, but the person injured is not to be deprived of all remedy. He has the right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and directly traceable thereto; and it is for the jury, under proper instruction, to determine the compensation to be awarded for the breach. That compensation should be the value of the contract."

They met with approval in *Agostini* v. *Consolvo,* 154 Va. 203, 153 S. E. 676, and in *Waller* v. *Welch,* 154 Va. 652, 153 S. E. 722.

If the business is new and without background, there is no base from which profits may be determined. *Whitehead* v. *Cape Henry Syndicate,* 111 Va. 193, 68 S. E. 263. But we know of no case in Virginia in which it was held that profits from a business long established and continuously successful could not be used in determining damages suffered from its destruction.

The rule in Virginia is that elsewhere adopted.

In *Parker* v. *Levin, supra,* a case, as we have seen, quite like this, the court said:

"It is true that damages cannot be computed with any exactness. But in the nature of things, a breach of the covenant against competition, under the circumstances of this case, would cause substantial damages."

"They (profits) need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion." *Lowrie* v. *Castle,* 225 Mass. 37, 113 N. E. 206, 210; *Ellerson* v. *Grove,*

44 F. (2d) 493; *Cantrell* v. *Knight* (Mo. App. 1934), 72 S. W. (2d) 196.

"The earlier decisions both in England and in this country generally excluded profits altogether as an element of recoverable damages both in actions for breach of contract and in tort. But this rule, under more modern practice, has been generally abandoned in both classes of actions, and, as a result, the right to recover profits is now generally determined by the same rules as govern the recovery of other damages." 8 R. C. L. p. 501.

Dailey testified that his business had been continuously prosperous; that daily sales had run from $25 to $35; that his gross profits were around forty per cent, and that his expenses ran around $85 a month. After the Grace street store was opened, this daily business fell away to $6 or $7; profits disappeared, he was unable to pay rent and was dispossessed. In short, his evidence is to the effect that his well established business was destroyed by competition from the Grace street store. If this be true, and if this destructive competition be based upon a breach of contract, then to deny him relief would be discreditable.

In this connection, it is said that no judgment can rest upon Dailey's uncorroborated testimony. This is true. Code, section 6209. It is not necessary that the corroborating evidence should be of itself sufficient to support a verdict. It must, of its own strength, tend to support some essential allegation. No universal rule can be applied. Each case turns upon its own facts. The statute only requires that "there should be such corroboration as would confirm and strengthen the belief of the jury in the testimony" of such adverse witnesses. *Burton's Ex'r* v. *Manson*, 142 Va. 500, 129 S. E. 356, 359; *Davies* v. *Silvey*, 148 Va. 132, 138 S. E. 513; *Cannon* v. *Cannon*, 158 Va. 12, 163 S. E. 405. When one is testifying as to transactions had with another who is incapable of testifying, the necessities for corroboration are greater than when, in such a suit, he undertakes to testify as to matters which may ultimately affect that estate but which are not directly connected with

decedent. We should scan closely all that Dailey says took place between him and Krikorian. When he undertakes to tell us what his daily sales were, the opportunities for fraud are less, and the necessities for corroboration are not so urgent. This entire record tends to corroborate Dailey as to the character of the controversy and as to the contentions of the parties. The leases themselves do, and more important still are books of original entry showing the volume of sales before and after competition set in. A business which had been prosperous fell away and was only about one-fifth of what it had been. A tenant who had theretofore paid his rent with regularity became unable to pay it at all. Profits must have diminished. Costs of operation could not have been materially lessened.

A careful examination of the entire record leads us to the conclusion that Dailey's evidence has been confirmed and strengthened, although it is true that this does not apply to everything that he said. Nor is that necessary. This conclusion is strengthened by the jury's verdict. Competition only could have driven this prosperous merchant into bankruptcy.

It is charged that error was committed in the introduction of certain letters in evidence. The lease to the Chamblees bears date July 19, 1935, and they went into business in November of that year. On August 15, 1935, Mr. Page, counsel for Dailey, wrote to Krikorian, saying that he understood that a drug store and confectionery was to be opened on Grace street. Krikorian on August 26th replied saying that a drug store and not a confectionery would be opened there. Mr. Page answered on August 28th saying that a modern drug store was also a confectionery store. When these letters were tendered in evidence and objection was made to their introduction, the court said it understood counsel for the defendant proposed to show that all that had been done was done with plaintiff's consent, or at least without opposition from him. This understanding of the court was not questioned and is supported by contentions afterwards made. Plainly they were competent

to meet any claim of estoppel or consent. The situation is quite different from that in *Dove Co.* v. *New River Coal Co.,* 150 Va. 796, 143 S. E. 317, in which opposing counsel sought to build up their cases by argumentative correspondence. Dailey could not write in English and had to get some one to write for him.

█ If there was error in their admission, it was harmless error. The respective contentions made are abundantly proven to have been made by other evidence in the record tendered on behalf of both the plaintiff and the defendant.

Defendant's Instruction G was refused:

"The court instructs the jury that under the lease, dated July 2, 1935, between the plaintiff and the defendant's decedent, the said plaintiff agreed, and bound himself to pay the defendant's decedent fifty dollars per month which became due and payable on the first day of every month after October 1, 1935, at the office of Rose & Lafoon, Inc., Agents, and for the non-payment of such rent at the time and in the manner specified, the defendant's decedent had the right to re-enter the said property, and in order to maintain this suit, the plaintiff must show that he complied with and performed the agreement on his part; *and if the jury believe from the evidence that the plaintiff failed and refused to pay the said rent, according to the terms of the said lease, and that he was forced to give up the possession of the said property for non-payment of rent, then the plaintiff cannot recover, and the jury must find for the defendant.*"

The court struck out that italicized and for it substituted this:

"Unless you believe from the evidence in this case that the defendant prevented the plaintiff from performing the agreement on his part."

Plainly the court was right.

█ If Krikorian, in fact, broke his covenant and thereby made the insolvency of Dailey unavoidable, he cannot complain of those results which might have been expected to follow.

█

There are a number of other exceptions. We have examined them with care. They either deal with matters already properly dealt with or with those which are non-essential.

As we read the record, there are three issues upon which this case turns:

1. Was there a covenant broken?
2. Has Dailey been damaged thereby?
3. Is his judgment excessive?

In each instance the jury has found for the plaintiff, and in each instance there is evidence to support its findings.

The judgment is large, but we cannot say that it is excessive as a matter of law. There is nothing to show that the jury was influenced by improper motives, or that it misunderstood those principles of law applicable to the case in judgment.

Where contracts are broken, courts are alert to give relief. *Kiser* v. *Amalgamated Clothing Workers of America*, 169 Va. 574, 194 S. E. 727, 114 A. L. R. 1291.

We close by saying that the right to recover future profits is amply sustained by the able opinion of Prentis, J., in *Manss-Owens Co.* v. *Owens & Son, supra.*

There is no reversible error in the record. The judgment of the trial court should be affirmed, and it is so ordered.

*Affirmed.*