# Richmond

## M. D. CARPENTER, DOING BUSINESS AS CARPENTER DRILLING COMPANY v. THE TOWN OF GATE CITY, VIRGINIA.

November 25, 1946.

Record No. 3108.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*E. H. Richmond, Guy S. Chase* and *Robert Y. Neel,* for the plaintiff in error.

*Fred B. Greear,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

The Town of Gate City, Virginia, a municipal corporation, owns and operates the waterworks system supplying its inhabitants. Due to a dry season in the fall of 1943-4, there was a shortage in its water supply. Meetings were held by citizens of the town and by the town council to consider the necessity of securing additional water for the reservoir of the town. It was agreed that an additional flow of 50 gallons per minute was required.

The plaintiff, M. D. Carpenter, doing business as Carpenter Drilling Company, who had been drilling wells for twenty years, and was acquainted with the geology of the local area, actively participated in the purpose of these meetings. He appeared before the town council at its regular meeting January 3, 1944, and discussed with it its express plan to secure an additional supply of not less than 50 gallons per minute. He offered to dig a deepwater well with the required capacity near the reservoir of the town. At an adjourned meeting, on January 18, 1944, he met with the council, and presented to it a written contract, which he had prepared, covering his proposal to dig the planned well. After some disccussion, the council agreed to authorize the execution of the contract by its proper officers. The contract was entered into under date of February 12, 1944. Its construction or interpretation is the issue here.

The contract is divided into four sections. The pertinent and material provisions are as follows.

In section I it provides:

"Party of the second part (M. D. Carpenter) agrees to drill a deep water well for party of the first part at a point already selected by party of the first part and located near the large reservoir belonging and/or serving party of the first part in the town of Gate City, to an estimated depth of 800 feet capable of furnishing 50 gallons of water per minute under standard twelve hour test.

"Party of the second part agrees to furnish all necessary and proper drilling equipment, labor, material, supplies, and anything else necessary to complete said well as hereinafter set out at his own expense, and to begin and complete the work as rapidly as is practical after the execution and delivery of this agreement.

"Drilling said well includes all necessary drilling, casing, and testing for capacity, as hereinafter set out."

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

Section II provides:
"Said well will not be considered as complete until a

pumping test of twelve continuous hours duration has been made to determine the volume of the flow of said well.

"Said well shall be pumped continuously at the rate of not less than 50 gallons per minute for not less than twelve hours, and shall continue until the water runs out or the time has expired.

"Party of the second part will make pumping test as often and at such times as the party of the first part shall desire and convey to him its wishes and party of the first part agrees that party of the second part may make a test when he feels confident that a sufficient flow of water has been obtained to justify a test."

Section III provides:

"Party of the first part agrees to pay to party of the second part, upon completion of the foregoing a sum sufficient to fully pay for the work done by party of the second part, the amount of said sum to be computed as follows:

"For well complete to a depth not exceeding 800 feet $7.00 per foot.

"Price per foot for depths below 800 feet, will be increased $1.00 per foot, to-wit price for drilling from depth of 800 feet to 900 feet shall be $8.00 per foot, price for drilling from 900 feet to 1000 feet shall be $9.00 per foot, and the price per foot shall increase in the same manner to whatever depth is drilled.

"The pumping test hereinbefore mentioned consists both of installing the necessary pump, the actual pumping, and the removal of pumping equipment from the well and the bailing to clean the bottom of the hole after the final test, and the price for any and all pumping tests made which are required or permitted by this contract shall be $6.00 per hour."

Section IV provides:

"When the pumping test has been completed and the well has been accepted by the party of the first part the total sum of this contract becomes due as follows:".

 * * * * * *

There is then set forth the manner of the payment for drilling the well, with the final payment to be made twelve

months after acceptance, provided the well shall be free from certain specified faults.

Immediately following the above provisions of section IV, are the two following paragraphs:

"The parties hereto agree that in the event a sufficient flow of water to furnish 50 gallons per minute can not be obtained at the well site mentioned with the equipment furnished by the party of the second part, nevertheless party of the first part will pay to party of the second part such percentage of the price agreed to herein as the flow of water obtained at the date of acceptance of the well shall justify; however, party of the first part shall not pay anything to party of the second part for a flow of water unless the amount of water obtained is sufficiently strong that party of the first part shall use said water, and said well.

"For the purposes of clarifying the matter of price, if the flow of water is less than 50 gallons per minute, party of the first part agrees to pay for a flow of water of 25 gallons per minute at 50% stipulated drilling price plus the entire pumping test price; for 37½ gallons per minute flow, party of the first part agrees to pay 75% of the stipulated drilling price plus the entire pumping test price, etc."

Shortly after the execution of the contract, the place for drilling the well was designated, and Carpenter moved his equipment thereon and started the well. He drilled about 400 feet and made a pumping test. The test showed a flow of about 17 gallons per minute. He then drilled down to about 800 feet. He made another test and there was shown very little gain. The supply was about 20 gallons per minute. He drilled further and finally reached a 1200 foot depth. He put in a testing pump with a pipe leading down 400 feet, but was unable to complete the test for lack of proper equipment. He said he then talked with several of the councilmen personally, and "told them our pumping equipment wouldn't do and wanted to know if I would have to have written permission to move my machinery and order the equipment that it would take, expense for the

pump at no expense to them." It took about three months to get the new equipment, and he again dropped a pipe to a 400 foot level and began the test with a pump capable of throwing 100 gallons per minute. After pumping continually for twelve hours, the well, at the expiration of the last hour, produced between 25 and 30 gallons per minute. Carpenter drilled no farther, and moved his machinery from the premises. He presented the following bill to the town council on October 5th, 1944:

"TOWN OF GATE CITY
GATE CITY, VA.

WATER WELL

1200 feet depth of well

| | | |
|---|---|---|
| 1st. 800 ft. @ | $ 7.00 | $5600.00 |
| 800 ft. to 900 ft. @ | 8.00 | 800.00 |
| 900 ft. to 1000 ft. @ | 9.00 | 900.00 |
| 1000 ft. to 1100 ft. @ | 10.00 | 1000.00 |
| 1100 ft. to 1200 ft. @ | 11.00 | 1100.00 |
| TOTAL | | $9400.00 |

Last 12 hr. test continuous pumping showed 30 g. p. m. or 3/5 of desired flow.

| | | |
|---|---|---|
| Proper credit 2/5 of drilling total | $3760.00 | |
| Total adjusted drilling price | $5640.00 | $5640.00 |

1st. pumping test 31 hrs.
2nd. pumping test 18 hrs.
3rd. pumping test 42 hrs.

| | | |
|---|---|---|
| Total hours | 91 @ $6.00 per hr. | 546.00 |
| Total adjusted | | $6186.00" |

At its next regular meeting on November 6th, the council, by resolution, declined to accept the well on the ground

that it did not meet the requirements of the contract. Carpenter was accordingly advised, and told that the town would not accept the well because it did not have sufficient flow to justify its operation.

On March 6th, 1945, Carpenter instituted this suit.

After the evidence was heard, the court gave the jury the following single instruction:

"The Court instructs the jury that under the contract in question in this case the Town had the option of refusing to accept any well drilled by the plaintiff Carpenter if the well did not produce at least 50 gallons of water per minute upon a twelve hour test, and if the jury believe that the Town did not accept the well drilled by Carpenter and described in the evidence, then they shall find for the defendant."

The jury rendered a verdict for the defendant upon which the court entered judgment accordingly.

The plaintiff sets out seven assignments of error. Six of these assignments relate to admission of evidence, the granting and refusing of instructions, and the weight and sufficiency of the evidence. In the sixth, it is contended that: "The court erred in improperly constructing and construing the contract sued on."

It is conceded, at the bar of this court, that if the single instruction given was proper the judgment must be affirmed. This brings us directly to a consideration of the contract. The plaintiff contends that it lacks any patent or latent ambiguity, that it is plain and definite, and that, therefore, no extrinsic evidence is required for its interpretation, or is admissible for the purpose of altering, varying, or contradicting its terms.

In the construction of a contract, it is well settled that the whole instrument is to be considered, and not one provision only, in determining the meaning of any and all its parts; not the words merely in which the provisions are expressed but their object and purpose, as disclosed by the language, by the subject matter, the condition and situation of the parties. Consideration must be given to the general

circumstances surrounding or attending its execution, and effect given to each provision, if possible. Vol. 2, Digest of Virginia and West Virginia Reports (Michie), sections 39, et seq., citing many cases.

■ Discussing elementary principles in the construction of contracts, Mr. Justice Holt, in *Krikorian* v. *Dailey*, 171 Va. 16, 24, 197 S. E. 442, tersely said: "All of these rules are to be remembered, and the academic definition of words is often important, but more important still is the purpose of the covenant. Has that purpose been kept or broken?"

■ Construed under the foregoing rule, and according to the purpose and object sought to be accomplished, the terms and provisions of the contract are not doubtful, uncertain, or conflicting. Where language to be construed is unambiguous, it is elementary that its construction is a matter of law for the court. *Devany* v. *South Norfolk*, 143 Va. 768, 129 S. E. 672.

The first section provides for the digging of a well to an "estimated depth of 800 feet capable of furnishing 50 gallons of water per minute under standard twelve hour test."

The second section provides that, "Said well will not be considered as complete" until the foregoing specification of 50 gallons per minute in a twelve-hour test has been met. It further provides for the making of tests at the request of the town or by the plaintiff if he felt "confident that a sufficient flow of water has been obtained to justify a test."

The third section provides for the rates of payment to be made by the town "upon completion" of the well specified, and for the cost of pumping tests required under the contract.

The fourth section provides how and when payments shall be made after "the pumping test has been completed and the well has been accepted" by the town, with final payment to be made if the well was without certain faults at the expiration of twelve months after its "acceptance."

Thereafter follow the last two paragraphs of the contract, which are the basis of this action.

 The contract was drawn and prepared by Carpenter. Since its language is that of Carpenter, it is a basic principle, in case of doubt, that it is to be most strongly taken against him. However, as we read the contract, as a whole, under the rule hereinbefore stated, the intent and meaning of the two paragraphs are clear and conclusive.

The town had a definite contract with Carpenter to produce a well furnishing a flow of 50 gallons of water per minute, under a twelve-hour test. Upon the production of such a well, the town was obligated to make payment in accordance with its contract. The first of the paragraphs under discussion gives the town the election to accept a well, in the event it does not furnish 50 gallons per minute, upon payment of "such percentage of the price agreed to herein as the flow of water obtained at the date of acceptance of the well shall justify." There must be election and acceptance of such a well. Expressly and distinctly, in unequivocal terms, it is then provided that the town "shall not pay anything to party of the second part for a flow of water unless the amount of water obtained is sufficiently strong that party of the first part (the town) shall use said water, and said well."

The second paragraph relates solely to "clarifying the matter of price," in the event the town accepted, under the provisions of the foregoing paragraph, a well with a flow of water less than 50 gallons per minute. It does not clarify any other term or provision of the contract. Except as to stipulated price, it has no relation to any other provision of the contract, save the provisions in the paragraph immediately preceding.

 There was no evidence to show a want of good faith on the part of the town or its agents in refusing to accept a well producing between 25 and 30 gallons per minute. In fact, the evidence shows that it would have been impracticable and uneconomical to operate such a well. There was no limit to the distance to which Carpenter could have sunk the well. He was not directed to stop at 800 feet or 1200 feet. The town was not required to make any pay-

ment unless the well produced 50 gallons per minute. It had the right to accept a well producing a lesser flow, provided the town could utilize it. It did not accept the well or use it, and the evidence justifies its refusal in not accepting it.

The plaintiff further contends that the instruction ignores his right to receive compensation for the pumping tests. This question was not expressly raised in the instructions requested in the lower court or otherwise. The tests for capacity were not made at the request of the town. They were merely tests for the information of the plaintiff during the progress of his work. In addition, it is expressly provided in the next to the last clause of the contract that the town "shall not pay anything" for a flow of water unless the amount obtained shall be "sufficiently strong" to justify its use for the purpose desired.

In view of the conclusion which we have reached, it is unnecessary to consider the remaining assignments of error. It is sufficient to say that the testimony objected to, be it admissible or inadmissible as evidence, is in full accord with the construction which the trial court gave to the language of the contract.

Upon the whole case, we are of opinion that the judgment is consistent with the right of the case, the objective of our judicial system.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*