## CIRCUIT COURT OF FAIRFAX COUNTY

Fairfax County Redevelopment
and Housing Authority

v.

W. M. Schlosser Co., Inc.

October 31, 1996

Case No. (Law) 097570

BY JUDGE ARTHUR B. VIEREGG, JR.

In this case, the Fairfax County Redevelopment and Housing Authority (hereinafter "the Authority") seeks judicial review of an adverse administrative decision made by the County Executive with respect to a construction contract dispute between the Authority and W. M. Schlosser Company, Inc. (hereinafter "Schlosser"). The crux of the dispute is the amount of compensation to which Schlosser is entitled for the removal and replacement of unsuitable soils as part of its contractual obligation to construct the first phase of a motor home residential facility.

The Authority contends that the Schlosser Contract required Schlosser to perform all work, including the removal and replacement of unsuitable soils, for a lump sum price of $3,192,000.00. Schlosser, however, claims that in addition to the lump sum price of $3,192,000.00, it should be compensated an additional sum of money for the removal and replacement of unsuitable soils.

Schlosser's claim for additional compensation initially was denied by the Authority's Director in a letter dated June 1, 1989. Sch. Ex. 17. In accordance with the contract's disputes resolution clause, Schlosser appealed that adverse

decision to the County Executive.[1] On May 25, 1990, the County Executive reversed the Director's decision and awarded Schlosser $634,412.00 in additional compensation for the removal and replacement of unsuitable soils. The Authority brought this appeal seeking judicial review of the County Executive's decision.[2]

This appeal is governed by the Virginia Procurement Act, Va. Code § 11-35 et seq. Pursuant to Virginia Code § 11-71, the County Executive's findings of fact are binding upon the parties unless shown to be fraudulent, arbitrary, or capricious. The Authority does not contend that the County Executive's decision was subject to such infirmities. Instead, the Authority contends (i) the County Executive wrongly interpreted the contract in holding that Schlosser is entitled to additional compensation for the removal and replacement of unsuitable soils, (ii) if the contract were interpreted as Schlosser contends, its provisions would be violative of the Virginia Procurement Act, and (iii) even if Schlosser is otherwise entitled to additional compensation, Schlosser failed to provide notice of its intent to file a claim for the unsuitable soils work, thus forfeiting its right to compensation. This Court must consider the legal issues advanced by the Authority de novo. See, Va. Code § 11-71.

On September 9, 1996, counsel for each of the parties presented oral argument in support of their cross-motions for summary judgment. At the conclusion of that hearing, I took the questions before me under advisement in order to study the briefs submitted by the parties. I am now prepared to rule.

## I. *Facts*

The record reflects the following undisputed facts.

As early as 1981, the Authority had attempted to determine the extent of unsuitable soils located on the proposed site for construction of a motor home

---

[1] The Virginia Procurement Act empowers governmental entities, such as the Authority, to adopt administrative procedures for the resolution of contract disputes. See, Va. Code § 11-71. Pursuant to this authority, the parties adopted certain dispute resolution procedures in Article 7.4 of their contract. Sch. Ex. 8.

[2] After the Authority appealed to this Court, Schlosser removed the case to the United States District Court for the Eastern District of Virginia. On November 19, 1990, the District Court entered judgment in favor of Schlosser in the amount of $634,432.00. Sch. Ex. 22 and 23. The Authority appealed the District Court's decision, and on September 5, 1995, the United States Court of Appeals for the Fourth Circuit reversed, holding that the District Court did not have jurisdiction to review the findings of the County Executive and remanded the case to this Court for review. *Fairfax County Redev. and Housing Auth. v. W. M. Schlosser Co.*, 64 F.3d 155 (4th Cir. 1995).

residential facility. However, extensive borings taken in 1981 and 1987 failed to disclose the magnitude of unsuitable soils present. Sch. Ex. 19.

In 1988 the Authority solicited bids from various contractors for the construction of Phase 1 of the Woodley-Nightingale Redevelopment Project. In response, Schlosser submitted a lump sum bid of $3,192,000.00 and a Schedule of Values setting forth unit-prices for the removal and replacement of unsuitable soils in the amount of $24.00 per cubic yard and $14.00 per cubic yard, respectively. Sch. Ex. 4.

The Authority awarded Schlosser the contract for the construction of the mobile home residential facility and entered into the Schlosser Contract on August 2, 1988. Sch. Ex. 3.

During the course of construction, Schlosser removed and replaced unsuitable soils. This work was monitored by the Authority's field representative who, pursuant to Section 02202 of the contract's Specific Conditions (see, Sch. Ex. 5), noted the quantities of unsuitable soils removed and replaced and furnished such information to the Authority on a weekly basis. Sch. Ex. 19. The Authority's representative then periodically drafted timely change order requests by which Schlosser requested compensation for the unsuitable soils work. Sch. Exs. 9 and 10. Payment for such work was denied by the Authority (see, Sch. Exs. 12, 13, and 14) and after negotiations between Schlosser and the Authority failed, Schlosser invoked the formal disputes resolution clause contained in Article 7.4 of the contract's General Conditions. This litigation ensued.

## II. *The Contract*

### A. *Provisions Relating to Payment for the Removal and Replacement of Unsuitable Soils*

The Authority contends that Schlosser is not entitled to additional compensation for the removal and replacement of unsuitable soils under the provisions of the Schlosser Contract. In support of this argument, the Authority relies upon Article 5 of the contract which obligated Schlosser to complete all of the work for $3,192,000.00 subject "to additions and deductions ... as otherwise provided in the Contract Documents." Sch. Ex. 3. The Contract Documents consisted of the Advertisement for Bids, the Information for Bidders, the Form of Bid, Drawings, General Conditions and Special Conditions, Specifications, all Addenda issued prior to execution of the work, and all Modifications (change orders, contract amendments, or field orders).

In the Information for Bidders, bidders were instructed to submit lump sum bids for the performance of the work. Bidders were then required to provide a detailed breakdown of their lump sum bid using the Schedule of Values set forth on page A-18 of the Contract Documents. Sch. Ex. 7. However, with respect to "[p]ayment for suitable [sic] material excavations," the bidders were informed that:

> 1. Unsuitable material is defined as highly plastic silts or clays as determined by the soil engineer in accordance with the approved soil report.[3]
> 2. Measurement of the unsuitable material shall be established with the Owner's Field Representative, and signed tickets shall be retained by him. The Engineer and the Owner shall be kept informed weekly of these costs. The costs as hereinafter noted include the total money paid, including overhead and profit.
> 3. Payment for removal from site and replacement shall be on a *unit price basis* per Schedule of Values. (See page A-18.) [Emphasis added.]

Sch. Ex. 7.

Identical language to that cited above also appears in Section 02202 of the Special Conditions section of the contract. See, Sch. Ex. 5.

The Schedule of Values contained a breakdown of the work to be performed from which bidders were instructed to assign values to each category of work, which, in the aggregate, would equal their lump sum bid. Following the listing of the various categories of work, the Schedule of Values included a separate section in which the bidder was directed to set forth per cubic yard unit-prices for removal and replacement of unsuitable soils. Sch. Ex. 4.

Several other provisions of the Contract Documents are pertinent to arguments advanced on behalf of the Authority in support of its claim that the Contract Sum was the total compensation to be paid to Schlosser for project work. First of all, the Form of Bid provides:

> The undersigned agrees, if awarded the contract, to execute and totally complete the work for the stipulated sum of BASE BID "Three

---

[3] The definition of "unsuitable soils" was subsequently expanded by mutual agreement in an addendum to the contract dated June 14, 1988.

Million One Hundred Ninety-Two Dollars and 00 Cents" DOLLARS ($3,192,000.00).

Sch. Ex. 2.

Secondly, Section A-8, paragraph B, of the Information for Bidders provides:

> The Successful Bidder, subject to Paragraph 12.9 of the General Conditions entitled "Subsurface Conditions Found Different," assumes all risk as to the nature and behavior of the soil or subsurface conditions which underlie the work or is adjacent thereto, or difficulties that may be due to any unfavorable conditions that may be encountered in the work, whether apparent on surface inspection or disclosed after construction begins.

Sch. Ex. 6.

Additionally, Section A-8, paragraph E, of the Information for Bidders provides:

> This Contract includes excavation on an unclassified basis. The cost of all excavation required under this Contract will be merged into the base bid. No distinction will be made insofar as payment is concerned between earth and rock.

Sch. Ex. 6.

Finally, Section A-10 of the Information for Bidders provides:

> The Successful Bidder shall furnish a Performance Bond in an amount equal to one hundred percent (100%) of the Contract Sum as security for the faithful performance of this Contract and also a Labor and Material Payment Bond in an amount not less than one hundred percent (100%) of the Contract Sum, as security for the payment of all persons performing labor and furnishing materials under this Contract. The Performance Bond and the Labor and Material Payment Bond shall be in separate instruments acceptable to the Owner, in accordance with State law and shall be delivered to the Owner not later than the date of execution of the Contract.

Sch. Ex. 6.

B. *Provisions Relating to Notice Requirements*

The Authority additionally contends that Schlosser was required to give advance notice of its intent to remove and replace unsuitable soils as a condition precedent to its right to be compensated for such work. In support of this notice argument, the Authority first relies on General Condition 12.10.1 which provides:

12.10 *Claims for Additional Cost and/or Time*

. If the Contractor wishes to make a claim for an increase in the Contract Sum and/or Contract Time, he shall give the A/E written notice thereof within twenty (20) calendar days after the occurrence of the event giving rise to such claim. This notice shall be given by the Contractor before proceeding to execute the Work, except in an emergency endangering life or property, in which case the Contractor shall proceed as provided in Article 10. No claim shall be allowed, and no amounts paid for any and all costs incurred more than twenty (20) days prior to the time notice is given to the A/E as herein provided. Any change in the Contract Sum and/or Contract Time resulting from such claim shall be authorized by Change Order. The Contractor's complete claim submittal, for an increase in the Contract Sum, shall be submitted no later than twenty (20) calendar days after the work for which the claim is made has been completed or after the request of the Owner of A/E.

Sch. Ex. 8.

Secondly, the Authority relies upon General Condition 12.5.1 which provides:

12.5 *Change Order*

A Change Order is a written order to the Contractor signed by the Owner and the A/E, issued after execution of the Contract, authorizing a Change in the Work or an adjustment in the Contract Sum and/or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order. A Change Order signed by the Contractor indicates his agreement therewith, including the adjustment in the Contract Sum and/or the Contract Time. Change Orders shall be numbered consecutively by date of issuance by the Owner or A/E and shall, if applicable, indicate the number of the

Field Order(s), Request for Proposal(s), and/or Proposed Change Order(s) to which it relates.

Sch. Ex. 8.

## III. *Decision*

### A. *Interpretation of the Contract Payment Provisions*

In construing the meaning of an agreement, a court must attempt to determine what was intended by the parties. *American Realty Trust v. Chase Manhattan Bank*, 222 Va. 392 (1981). Moreover, in doing so, a court is bound to interpret the contract in accordance with the plain meaning of the words used by the parties. *Graphic Arts Mut. Ins. Co. v. C. W. Warthen Co.*, 240 Va. 457 (1990). In attempting to determine that meaning, the court should take into account all language employed by the parties to memorialize their agreement and must attempt to accord meaning to all language used. *Paramount Termite Control Co. v. Rector*, 238 Va. 171 (1989). And the court should avoid a result which is absurd or nonsensical. *Transit Cas. Co. v. Hartman's, Inc.*, 218 Va. 703 (1978). Only then, if the intention of the parties cannot be determined, may a court resort to rules of contract construction or parol evidence. *The Anden Group v. Leesburg Joint Venture*, 237 Va. 453 (1989).

Both parties urged this court, in oral argument and on brief, to consider extraneous facts supporting their interpretations of the contract. Schlosser contends its interpretation of the contract must prevail because other bidders had interpreted the Information to Bidders in the same manner as it had. On the other hand, the Authority contends that this Court must consider the terms of Schlosser's earthmoving subcontract in order to evaluate the meaning of the Owner-Contractor Agreement. Neither of these circumstances have been considered since the parties' intention is otherwise apparent from the plain meaning of the terms agreed in the contract.

Furthermore, the Authority's reliance on Paragraph A-9(D) of the Contract Documents (essentially resolving all ambiguities in favor of the Authority) and on *Martin & Gass, Inc. v. Board of Supervisors of Fairfax County*, At Law No. 101500 (Dec. 4, 1991) (enforcing such provisions) is also misplaced. Since the parties' intent is evidenced from the contractual language, this court need not rely on the contract's rule of construction provisions to resolve the issues in this case.

In determining the plain meaning of the contractual language adopted by parties, a court may also evaluate the words used in light of the circumstances surrounding the making of the contract. *Carpenter v. Town of Gate City*, 185 Va. 734 (1946). Here, it is undisputed that the Authority's engineers did not

know the extent of the unsuitable soils to be removed and replaced. *See,* County Executive's decision of May 25, 1990. (Sch. Ex. 19.) The unit-price basis of compensation for the removal and replacement of unsuitable soils on an after-the-fact basis was therefore a logical and reasonable way to protect the contractor from cost-overruns on account of the undetermined quantity of bad soil to be removed and replaced and to protect the Authority in obtaining low bids not inflated by arbitrary contingencies for such unsuitable soils work.

Moreover, the Information for Bidders and the Special Conditions expressly provided that Schlosser be compensated for the removal and replacement of unsuitable soils in accordance with the unit-prices in the Schedule of Values. Since the quantity of unsuitable soils to be removed and replaced was unknown when the contract was signed and since the contract expressly provided Schlosser was to be compensated for this work on a unit-price basis, the unit-prices were necessarily included to compensate Schlosser for work not included in the Contract Sum of $3,192,000.00.

The Authority has advanced no plausible alternative explanation for the express contractual language mandating that Schlosser be compensated on a unit-price basis for the removal and replacement of unsuitable soils. Instead, the Authority advances arguments based on provisions not specifically relating to the removal and replacement of unsuitable soils which, it contends, may be read as being inconsistent with the explicit unit-price method of compensation to Schlosser for unsuitable soil removal and replacement.

The Authority first relies upon language in the Form of Bid in which Schlosser agreed to complete all work for $3,192,000.00. *See,* Sch. Ex. 5. However, the Authority ignores the fact that the Form of Bid also stated immediately thereafter:

> (The above total price shall be listed using both words and numbers. In the event the base bid and the extension of unit prices do not agree, the unit prices shall govern ... .)

Sch. Ex. 2.

The Form of Bid, which was part of the Invitation to Bidders, assumed that the contract would be either a lump sum contract or a unit-price contract but not that it would contain elements of both. In view of the fact that other language in the Invitation to Bidders indicated a contract containing hybrid compensation provisions (i.e., that all the work would be done for a lump sum but removal and replacement of unsuitable soils would be performed for agreed-upon unit-prices), the statement in the Form of Bid does not control the intention of the parties. This conclusion is corroborated by the provisions in

the Owner-Contractor Agreement which reiterate such unit-priced compensation for unsuitable soils work. Therefore, considering the language of the contract as a whole, the parties must have intended that the Contract Sum would govern the compensation to be paid for all work, except the unsuitable soils work which was to be calculated on a unit-price basis. *See, Paramount Termite Control Co. v. Rector*, 238 Va. 171 (1989).

The Authority next contends that risk-shifting provisions in the contract requiring Schlosser to accept all risks of added costs due to the difficulty of performing the work or due to the nature of subsurface conditions (see, Sch. Ex. 6) necessarily demonstrate that the parties did not intend for unsuitable soils work to be compensated by additional unit-priced compensation. These provisions, however, only deal with claims for extra compensation for circumstances not anticipated by the parties in the original contract and therefore clearly do not apply to the removal and replacement of unsuitable soils. It is evident from the Authority's borings taken in 1981 and 1987 that the Authority knew a significant amount of unsuitable soils was present on its land. Furthermore, it is evident from the terms of the contract specifically addressing how Schlosser was to be paid for the removal and replacement of unsuitable soils that the Authority anticipated such work would have to be performed. While the risk-shifting provisions would have precluded Schlosser from recovering more than the unit-prices for difficulties encountered in removing and replacing unsuitable soils on the site, they do not negate the Authority's agreement to pay Schlosser the added unit-priced compensation for the removal and replacement of those soils.

The Authority's arguments based on these and similar inconsistencies[4] not only violate the cardinal rule of contract construction that a contract must be

---

[4] The contract mandated that Schlosser present performance and payment bonds in the amount of the Contract Sum. Sch. Ex. 6. The penalty amount of each of the bonds submitted by Schlosser was $3,192,000.00. The Authority argues that since the amount of the penalty of those bonds is equal to the bid submitted by Schlosser, the parties must have intended that the Contract Sum included compensation for the removal and replacement of unsuitable soils.

The contract also mandated that excavation be done on an unclassified basis with costs for such work merged into the base bid. Sch. Ex. 6. The Authority contends that the removal and replacement of unsuitable soils is covered by this provision.

The court rejects both of these arguments. Like the Authority's other arguments which seized upon language which might be argued to suggest that all work was to be performed for a lump sum, the parties did not insert the penalty provision or the unclassified excavation provision for that purpose. The express unit-price compensation provisions demonstrate that the Authority's argument is flawed.

construed in accordance with the plain meaning of its terms, *Graphic Arts Mut. Ins. Co. v. C. W. Warthen Co.*, 240 Va. 457 (1990), but they also violate the well-accepted principle that a court must attempt to give meaning to all words purposefully used by the parties to express their intention. *Ames v. American Nat. Bank*, 163 Va. 1 (1934). If all the removal and replacement work was to be compensated as part of the lump Contract Sum, the explicit unit-price provisions would have been superfluous. Such a nonsensical interpretation must be rejected. *See, Transit Cas. Co. v. Hartman's, Inc.*, 218 Va. 703 (1978). The conclusion is inescapable that the unit-price provisions were included for a purpose: to make plain that Schlosser would be paid for this work, the extent of which was practicably undeterminable, on the basis of the amount of unsuitable soil actually removed and replaced.

## B. *Interpretation of the Virginia Procurement Act Requirements*

The Authority next argues that even if the contract were interpreted as Schlosser contends, the provisions regarding the removal and replacement of unsuitable soils would render the contract void *ab initio* for failure to set out in definite and complete terms the specific Contract Sum.

The Authority's voidness argument appears to be based on Virginia Code § 11-41(A):

> All public contracts with nongovernmental contractors ... for the purchase of ... construction, shall be awarded after competitive sealed bidding, or competitive negotiation ... unless otherwise provided by law.

The Authority variously, explicitly or implicitly, contends that (i) the Schlosser Contract was not procured by competitive negotiation; (ii) the Schlosser Contract was not procured by a process otherwise provided by law; and (iii) a contract for a lump sum plus a unit-price for an unknown quantity of services does not qualify as competitive sealed bidding as defined in Virginia Code § 11-27(1) because the price term was not a liquidated amount.

However, the relevant requirement for a bid to be competitive is that the invitation to bid contain or incorporate the specifications for the work as well as the contract provisions applicable to the job to be procured. See, Va. Code § 11-37. Since it cannot be disputed that Article 5 provided for consideration equal to a lump sum of $3,192,000.00 plus modifications, additions, or subtractions as called for in the Contract Documents and since the bid documents contained in the Section 02202 Specifications specifying that

payment for the unsuitable soils work would be made in accordance with unit-prices submitted and approved in the Schedules of Values, it is clear that each bidder received actual notice that the compensation to be paid for the work was the lump sum price of $3,192,000.00 plus an undetermined sum for the removal and replacement of unsuitable soils, which would be calculated after earth was removed and replaced.

Furthermore, counsel for the Authority conceded at oral argument that the Schlosser Contract was not a cost-plus contract and further that unit-price contracts do not violate the Act. Nothing in the Code suggests that a lump sum contract, a unit-price contract, or a hybrid of the two is illegal, nor does the Authority present legal authority for this argument. Moreover, by definition, final payment under contracts with unit-price provisions necessarily depend on the magnitude of the work performed, which can only be determined after-the-fact and, as such, cannot be stated in final and complete terms at the time the contract is created. The Schlosser Contract, therefore, was competitively bid and does not run afoul of Virginia Code § 11-41(A) for failure to state payment terms in definitive form.

## C. *Interpretation of the Notice Requirements*

The Authority alternatively argues that even if Schlosser was entitled to additional unit-price compensation for the removal and replacement of unsuitable soils, such compensation might only be obtained if Schlosser (i) afforded the Authority with notice of such a claim in advance of the time the work was to be performed and (ii) sought compensation by timely submission of a change order. In this regard, the Authority relies on General Condition 12.10.1, which requires written notice within twenty calendar days after the occurrence of the event giving rise to such a claim, and General Condition 12.5.1, which governs the use of change orders. *See,* Sch. Ex. 8.

In general, the purpose of provisions such as the ones found in General Condition 12.10.1 and General Condition 12.5.1 are to inform the owner of any additional costs which were not within the contemplation of the parties at the time of the contracting. *See,* 1 Steven G. M. Stein, Construction Law § 4.03[1] at 4-24 (1996). However, in this case, no circumstances warrant the application of these general notice provisions to the removal and replacement of unsuitable soils. The Authority knew that unsuitable soils existed on the motor home project site; it had included the removal and replacement of such soils as part of the scope of Schlosser's work; it had agreed to pay for the removal and replacement of those unsuitable soils on a unit-price basis; it had agreed upon and implemented a procedure to determine the amount of

unsuitable soils removed; and it necessarily understood that the Contract Sum would be increased when the quantity of the unsuitable soils removed and replaced had been determined. Given that the contract expressly required such work to be performed, it is nonsensical to conclude that the parties intended that the notice provisions contained in the General Conditions were applicable and a condition precedent to Schlosser's entitlement to be compensated for the removal and replacement of unsuitable soils.

In support of its claim that the notice provisions of the General Conditions do apply to the removal and replacement of unsuitable soils, the Authority relies upon a decision of another judge of this court in *General Excavation, Inc. v. Fairfax County Supervisors*, 33 Va. Cir. 120 (1993) (Annunziata, J.), in which it was stated:

> At the hearing on the Plea in Bar, the Court specifically rejected the contention that work performed on a unit-price basis does not constitute a change in the scope of the work as contemplated by the contract. Consequently, the Court ruled that the contract's notice provisions applied to unit-price items.

However, the circuit judge in *General Excavation* neither specified the facts or the contract provisions which framed the issues involved in that case, nor did she cite authority for her bench ruling. I am therefore unpersuaded that the judge's holding in *General Excavation* should govern this case.

Furthermore, even if General Condition 12.10.1 did apply to the removal and replacement of unsuitable soils, actual notice was provided to the Authority by virtue of the fact that Schlosser removed and replaced unsuitable soils under the supervision of the Authority's field representative.

## IV. *Conclusion*

For all of the foregoing reasons, I conclude that the decision of the County Executive should be affirmed and that judgment should be entered in favor of Schlosser in the amount of $634,412 and its costs.[5] Mr. Cohen is requested to prepare an order awarding judgment to Schlosser consistent with this opinion.

---

[5] No interest is awarded for the reasons recited by the district court judge in his memorandum opinion of April 7, 1996. Sch. Ex. 27.