## Staunton

STATE-PLANTERS BANK OF COMMERCE AND TRUSTS, CO-EXECUTOR,
ETC., ET AL. V. STANDARD CARY CORPORATION.

SECOND NATIONAL BANK OF RICHMOND V. STANDARD CARY CORPORA-
TION.

September 8, 1967.

Records Nos. 6425, 6426.

Present, All the Justices.

*John W. Pearsall (Melvin R. Manning; John W. Pearsall, III; Mc-
Caul and Pearsall,* on brief), for appellants in Record No. 6425.

*James M. Minor, Jr. (Franklin J. Carter; G. Clinton Moore,* on
brief), for appellant in Record No. 6426.

*LeRoy R. Cohen, Jr. (Cohen, Kelley & Abeloff,* on brief), for
appellee in Record Nos. 6425 and 6426.

GORDON, J., delivered the opinion of the court.

In 1956 Hilton W. Goodwyn leased land in the Richmond Shop-
ping Center to Standard Cary Corporation ("Standard") under a
lease (the "1956 Lease") that contained restrictive covenants con-
cerned primarily with Standard's parking rights. In 1965 Goodwyn
leased other land in the Shopping Center to the Second National

Bank of Richmond. Goodwyn constructed banking facilities, including a building and other improvements, and provided for a drive-in teller lane on the land leased to the Bank. He also relocated an existing vehicular traffic lane so that it adjoined the new improvements and drive-in teller lane. As a result, about 10 parking spaces were eliminated.

Standard brought this suit against Goodwyn and the Bank to enjoin alleged violations of the restrictive covenants of the 1956 Lease, complaining particularly about the elimination of parking spaces and the Bank's proposed operation of drive-in teller facilities.[1]

For an understanding of the restrictive covenants we reproduce an aerial photograph of the Shopping Center taken in 1962, after Standard's drug store had been erected:

As shown on the photograph the Shopping Center is bounded by Ellwood Avenue on the north (bottom), Thompson Street on the west (right), Cary Street on the south (top) and Nansemond Street on the east (left). The Standard Drug Store is near the intersection of Ellwood Avenue and Nansemond Street (lower-left corner). A Colonial Store (the only major tenant of the Shopping Center when the 1956 Lease was made) stands to the right of the Standard Drug Store.

---

1. The 1956 Lease was between Hilton W. Goodwyn and Hallie M. Goodwyn, his wife, as landlords, and Standard Cary Corporation, as tenant. Hilton W. Goodwyn died in 1962. The landlords under the lease to Second National Bank of Richmond, made in 1965, were State-Planters Bank of Commerce and Trusts and H. W. Goodwyn, Jr., as executors of H. W. Goodwyn, Hallie M. Goodwyn, individually and as trustee under the will of H. W. Goodwyn, and Richmond Shopping Center, Incorporated, all of whom are defendants in this suit. In the text, our reference to "Hilton W. Goodwyn" is intended to include his wife (now widow), Hallie M. Goodwyn, and our references to "Goodwyn" are intended to refer to his widow and his successors in interest who are named in the preceding sentence.

The bank building and other improvements, which are the subject of this controversy, are not shown on the aerial photograph. They stand immediately to the right (west) of the Stuckey property at the upper-left (southeast) corner of the photograph, near the curb-cut on Cary Street identified by an arrow. Neither the Stuckey property nor the property at the upper-right corner is part of the Shopping Center.

The restrictive covenants describe the area reserved for parking by reference to a white print attached to the 1956 Lease, but the markings on the print do not clearly designate that area. However, counsel appear to agree that the area reserved for parking was: (1) the land to the left of the Standard building, and (2) the land above the upper line of Standard, Colonial and the building to the right of Colonial. Clearly excepted from the area reserved for parking were: (i) the land between the Standard and Colonial buildings, (ii) the land to the right of the Colonial building, (iii) the upper-left corner occupied by Stuckey, and (iv) the upper-right corner including the ABC store and the building and land to the west. The restrictive covenants also make or imply other exceptions.

The restrictive covenants read:

"4. The Landlord [Goodwyn] agrees that the parking area outlined on the white print aforesaid and attached hereto shall remain a parking area in its entirety throughout the terms of this lease and any extension and renewals thereof except that there is hereby reserved by the Landlord:

'And *expressly excepted from the parking area* above described.

a. A strip of land 25 feet in width fronting on Cary Street adjoining the present ABC Store and being the western 25 feet of the lessors [Goodwyn's] frontage on Cary Street. Said 25 feet paved [*sic*] extending northwardly 130 feet, the north line thereof coinciding with the north line of the said ABC Store Building.

b. *A strip of land 25 feet in width fronting on Cary Street adjoining the service station property now or formerly owned by A. B. Stuckey and being the eastern 25 feet of lessors [sic] frontage on Cary Street, said 25 foot parcel extending northwardly 130 feet, the north line thereof coinciding with the north line of the said A. B. Stuckey Property. And, of course, the drive in entrances on Cary Street will at a proper time be changed to accommodate any new structures on the said two strips of land excepted as aforesaid that might be built on the said strips of land.'*

"(4-1/2) 'It is agreed that the lessee's [Standard's] employees shall park their cars only at such places as may be designated by the lessor provided such places are either within the above described parking area or made available by lessor within 500 feet of lessee's premises. The lessee will provide lessor with the license numbers of its employee's [*sic*] cars within ten days following the request therefor.'

"(4-3/4) 'The lessor reserves for itself and its successors and assigns the right to rearrange said parking lot and side walks and to grant easements from time to time but *except as herein provided* not to change the character of the area. The lessor at all times shall maintain entrances and exits and approaches from [*sic*] the stores and through the parking facilities at least as good as the present arrangement.'" [Emphasis supplied.]

Under the lease to the Bank, made in 1965, Goodwyn leased a strip of land immediately west of the Stuckey property, fronting 35 feet on Cary Street and extending northwardly 130 feet. The frontage on Cary Street therefore exceeded the 25-foot frontage allowed under subparagraph 4b of the restrictive covenants. As provided in the lease Goodwyn constructed a bank building on the leased property, the west wall of which stands 25 feet west of the Stuckey property line.[2] At the same time Goodwyn made other improvements that extend up to about 10 feet beyond the west wall, added a drive-in teller lane and provided a new traffic lane, as shown on the following sketch:[3]

STUCKEY

DRIVE-IN TELLER LANE
FIRST FLOOR PLAN

TRAFFIC LANE & CURB-CUT

---

2. Standard contends that the west wall is 25 feet 6 inches from the Stuckey line, but for reasons to be given we must assume it is 25 feet from the line.

3. This sketch was properly rejected by the trial court because it was offered to prove, but did not even purport to show, the location of the west line of the Stuckey property. The sketch is used here because it depicts the subject now under discussion, the improvements and drive-in teller lane to the west of the west wall of the

As shown on the sketch Goodwyn constructed steps near Cary Street leading to an exterior walk along the west wall of the building. The walk, which is bordered on the outside by a concrete planter box, provides access to a glassed-in vestibule and from the vestibule into the building. The vestibule extends about 10 feet from the west wall of the building. It is bordered on the north by another concrete planter box. To the north of this planter box there is a drive-in teller lane providing access to two teller windows. The windows and, to a greater extent, the canopies over the windows project from the west wall of the building. Legs of the west wall and a night depository box also project from the wall. Pavements or curbings, indicated by dots on the sketch, have been constructed on the west side of the building.[4]

While the building was under construction an existing curb-cut or drive-in entrance on Cary Street (identified by an arrow on the aerial photograph reproduced *supra* p. 299) and the accompanying 24-foot traffic lane in the Shopping Center were moved to the west. The record does not show the exact location of the curb-cut before it was moved, but the witnesses agreed it would have been blocked by the building. The eastern edge of the new curb-cut and 24-foot traffic lane is about 10 feet west of the west wall of the building, separated from the building as shown on the sketch reproduced *supra* p. 301. If the eastern edge of the new curb-cut and traffic lane had been placed against the west wall of the building, about 10 of the formerly existing parking spaces would have been preserved.

Basically Standard contends that Goodwyn and the Bank violated the restrictive covenants of the 1956 Lease by: (1) eliminating parking spaces west of the bank building, and (2) constructing drive-in teller facilities that would cause increased congestion in the Shopping Center when they were opened for business. The trial court fully sustained Standard's position. By the decree appealed from, the court (among other things) directed Goodwyn to demolish part of the

---

building. The variations between the sketch and the final plans for the building (for example, the shortening of the planter box adjoining the exterior walk to provide access to the walk near the vestibule) are inconsequential in determining the issues before us.

4. As shown on the sketch there is a pavement, an entrance and a planter box on the north end of the building. It is not clear from the evidence or exhibits whether the north line of these improvements is more than 130 feet north of the Cary Street frontage. In any event Standard has made no complaint about these improvements.

bank improvements and restrained Goodwyn and the Bank from operating any drive-in facility on the leased premises.[5]

Before dealing with the more troublesome issue, which involves an interpretation of the restrictive covenants, we will deal with Standard's contention that the west wall of the bank building protrudes 6 inches onto the area reserved for parking by the restrictive covenants.

During the trial Standard attempted to prove that the outer west wall was 25 feet 6 inches west of the Goodwyn-Stuckey boundary line and therefore extended 6 inches west of the 25-foot strip described in subparagraph 4b of the restrictive covenants. It attempted to prove this by introducing evidence indicating that the outer east wall (which was admittedly 25 feet from the outer west wall) stood not on the boundary line, but 6 inches west of the boundary line.

But Standard's evidence left the true location of the boundary line a matter of conjecture. It consisted only of an architect's drawing indicating that the boundary line was 6 inches east of the east wall of the bank building and of testimony that a hub had been placed in the sidewalk 6 inches east of the east wall. No evidence was introduced to show either the metes and bounds of the property conveyed to Goodwyn and to his predecessors in title, or to show the metes and bounds of the property conveyed to Stuckey and to his predecessors in title. So Standard failed to sustain its burden, as a complain-

---

5. The trial court (1) held that Goodwyn had no right to lease to the Bank for its exclusive purposes any land fronting on Cary Street at the eastern end of the Richmond Shopping Center except "a strip of land 25 feet in width fronting on Cary Street adjoining the service station now or formerly owned by A. B. Stuckey (being the eastern 25 feet of the frontage of the Goodwyn interests on Cary Street) and extending northwardly 130 feet from the north line of Cary Street, the north line thereof coinciding with the north line of the said A. B. Stuckey property"; (2) cancelled the lease between Goodwyn and the Bank, with leave to amend the lease so as to demise only the strip of land described in clause (1), provided the amended lease does not violate any other provision of the decree; (3) enjoined Goodwyn (i) to demolish and remove so much of the Bank's building and structures as lies outside the boundaries of the strip described in clause (1), and (ii) "to hardsurface the area affected so that, so long as the . . . [1956 Lease] to complainant [Standard] . . . shall be in force and effect, the same shall be and remain a parking area as heretofore"; (4) enjoined Goodwyn and the Bank, so long as the 1956 Lease is in effect, from maintaining upon any part of the premises leased to the Bank, whether or not within the boundaries of the strip described in clause (1), "automobile drive-in tellers' windows or cubicles and from using the property or any part thereof or any structures thereon for the transaction of business with customers remaining in motor vehicles"; (5) enjoined Goodwyn "to open a curb crossing at or near the eastern end of . . . [his] Cary Street frontage to replace the curb crossing closed by . . . [him] following the execution of the lease . . . to the Bank"; and (6) assessed costs against Goodwyn and the Bank.

ant seeking an injunction, of proving that the Bank's outer west wall was more than 25 feet west of the Goodwyn-Stuckey boundary line.

The improvements west of the Bank's west wall (see sketch, *supra* p. 301) are admittedly more than 25 feet from the Goodwyn-Stuckey boundary line. So the next and more troublesome issue is whether Goodwyn and the Bank violated the restrictive covenants by eliminating parking spaces as a result of the construction of these improvements and the installation of drive-in teller facilities and a relocated traffic lane.

In considering this issue we must first determine, from the language used in the restrictive covenants and in the light of the circumstances under which they were written, what purposes the parties intended the covenants to serve. (The covenants are copied *supra* pp. 300-301.) At the same time, we must remember that covenants such as these, which restrict the free use of land, are not favored and should be strictly construed against the party seeking to enforce them. Standard has the burden of establishing that these covenants, so construed, prohibited what Goodwyn and the Bank did. See *Traylor* v. *Holloway*, 206 Va. 257, 142 S.E.2d 521 (1965); *Jernigan* v. *Capps*, 187 Va. 73, 45 S.E.2d 886 (1948).

## (1)

The first purpose of the restrictive covenants was to create and protect Standard's right to certain parking spaces for its customers and employees, in common with customers and employees of other facilities in the Shopping Center. This purpose was expressed by the language of the covenants; it was consistent with the circumstances that prompted Standard's execution of the 1956 Lease, the desire to conduct a business in the shopping center. But, as we will point out, other provisions of the restrictive covenants expressly qualified Standard's right to parking spaces.

The first question, then, is whether the restrictive covenants forbad the elimination of about 10 parking spaces west of the new bank building. If so, the covenants concerning parking were violated. If not, those covenants were not violated. And if the covenants did not forbid the elimination of those parking spaces, Standard's right to use them ceased; and its right having ceased, Standard has no right to complain about the construction of improvements and the installation of drive-in teller facilities and the relocated traffic lane west of the new bank building.

Crucial in answering this question are the last sentence of subparagraph 4b and the first sentence of paragraph 4-3/4 of the restrictive covenants.[6] The last sentence of subparagraph 4b recognized that the curb-cut or drive-in entrance on Cary Street would be moved to accommodate a structure built on the strip described in subparagraph 4b, *supra* p. 300—the strip on which the bank building was constructed. The first sentence of subparagraph 4-3/4 reserved to Goodwyn the right to rearrange the parking lot and sidewalks and to grant easements from time to time.

Subparagraph 4b made only one qualification to Goodwyn's right to move the curb-cut: that the curb-cut should be relocated so as to "accommodate" the new building (the bank building), that is, so as to provide safe passage into and out of the building. Goodwyn was therefore free to fix the new location of the curb-cut provided he chose a location that reasonably accomplished this objective. He relocated it 10 feet from the west wall of the building.

In so placing the new curb-cut Goodwyn followed the consistent practice of separating pedestrian and vehicular traffic in the Shopping Center. For example, a 10-foot sidewalk next to the Standard building separates pedestrian and vehicular traffic. The improvements on the 10-foot strip west of the new bank building serve the same purpose, to protect pedestrians. Even Standard's expert witness said he would not have placed the new curb-cut next to the bank building. And in answer to the question "this [Goodwyn's] relocation of the curb-cut does not diminish the parking any more than any other relocation?" this witness said "I think that's right". Therefore, we must conclude that Goodwyn acted reasonably in moving the curb-cut to its present location.

So located, the new curb-cut and the accompanying traffic lane in the Shopping Center made the 10-foot strip between the traffic lane and the west wall of the new bank building practically unusable for parking. Only a few cars could have been parked on the strip, parallel to the traffic lane and bank building. Such parking would have been unique in the Shopping Center, since no other space was de-

---

6. "[4]b. ' * * * And, of course, the drive in entrances on Cary Street will at a proper time be changed to accommodate any new structures on the said two strips of land excepted as aforesaid that might be built on the said strips of land.'
* * *

"(4-3/4) 'The lessor reserves for itself and its successors and assigns the right to rearrange said parking lot and side walks and to grant easements from time to time but except as herein provided not to change the character of the area, * * *' "

signed for parking parallel to a traffic lane. And the space in front of the entrance to the new building could not have been properly used for parking, because any car parked there would have blocked the entrance. The parties to the restrictive covenants contemplated that Goodwyn would maintain free access to the buildings in the Shopping Center. (See last sentence, paragraph 4-3/4, quoted *supra* p. 301.)

The covenants expressly permitted Goodwyn also ". . . to rearrange said parking lot and side walks and to grant easements from time to time. . ." (first sentence, paragraph 4-3/4, quoted *supra* n. 6). Because this language is not entirely clear, we must construe its intent strictly against Standard. So construed, we conclude that this language gave Goodwyn the right to grant an easement for the placing of a drive-in teller lane, with an adjoining curbing and planter box to facilitate the flow of traffic, and for the placing of an exterior walk and adjoining planter box (see sketch, *supra* p. 301). The fact that Goodwyn leased the 10-foot strip, instead of granting an easement for the placing of a drive-in teller lane and an exterior walk and other improvements on the strip, did not prejudice any of Standard's rights.

We recognize that Goodwyn may not have been authorized to grant an easement for the construction of the vestibule, which is part of the bank building. But, as we have pointed out, cars could not have been properly parked in the space occupied by the vestibule because they would have blocked the entrance into the building. So Standard's parking rights were not violated by the leasing of this space and the construction of the vestibule. We must remember that this case does not involve the construction of improvements on another person's land; Goodwyn, not Standard, owned the land on which the vestibule and other improvements were constructed. Rather, this case involves the attempted enforcement of restrictive covenants that were designed to accomplish only narrow purposes.

Standard's practical construction of the restrictive covenants of the earlier Colonial lease, which are substantially the same as those of the 1956 Lease, aids us in reaching the conclusion that Goodwyn had the right to grant the easement referred to in the second preceding paragraph. Standard asserted in this suit that Goodwyn had the right, notwithstanding the restrictive covenants of the Colonial lease, to grant permission for the placing of a 10-foot sidewalk next to Standard's building.

We have concluded that Goodwyn had the right to relocate the curb-cut and traffic lane 10 feet west of the bank building and to place a drive-in teller lane and a sidewalk between the traffic lane and the building. True, the restrictive covenants of the 1956 Lease provided that Goodwyn should not "change the character of the area" (*supra* n. 6). But these words followed the qualifying words "except as herein provided", which referred (among other things) to Goodwyn's right to move the curb-cut and grant easements. The qualifying words therefore confirmed Goodwyn's right to relocate the curb-cut and traffic lane and to place a drive-in teller lane and sidewalk next to the bank building.

Upon Goodwyn's exercise of this right, the 10-foot strip west of the new bank building and the adjoining traffic lane were no longer usable for parking. So when he exercised this right, Standard's right to use this area for parking was properly terminated. The first purpose of the restrictive covenants being to give Standard only parking rights, which have been properly terminated as to the area in question, Standard has no standing to complain about the use to which this area has been put.

## (2)

The other purpose of the restrictive covenants is disclosed in the last sentence of paragraph 4-3/4. By this covenant Goodwyn guaranteed that he would "maintain entrances and exits and approaches from [*sic*] the stores and through the parking facilities at least as good as the present [1956] arrangement". (See last sentence, paragraph 4-3/4, quoted *supra* p. 301). Standard contends that Goodwyn and the Bank violated this restrictive covenant by constructing drive-in teller facilities that would cause increased congestion in the Shopping Center when they were opened for business. (The Bank had not opened for business when this suit was tried.) The trial court upheld Standard's contention by enjoining Goodwyn and the Bank from maintaining any drive-in teller window or cubicle on the leased premises and from using the premises for the transaction of business with customers in motor vehicles. (See n. 5, *supra*.)

The parties introduced lengthy testimony intended to prove or disprove the contention that the drive-in teller facilities would cause increased congestion in the Shopping Center. But interpreting the restrictive covenant strictly against Standard, as we must, we find that it does not relate to congestion. This interpretation is not only

consistent with the language of the covenant, which does not mention congestion, but also reasonable under the circumstances. Congestion can be reasonably anticipated in a shopping center. In fact Standard's expert witness said: "I don't know of any . . . [shopping center] laid out that didn't have congestion in it. You want congestion because you want business."

We interpret the language of the covenant as intended to guarantee only that physical entrances, exits and approaches would be maintained, not as intended to protect Standard against increased congestion. There is no evidence to indicate that the driveways and sidewalks in the Shopping Center or the approaches to the stores are now inferior to those existing in 1956. New curb-cuts have been opened on Ellwood Avenue between Standard and Colonial and, also, between Colonial and the building to the west, and these areas have been paved for vehicular traffic and parking. (These areas are shown on the aerial photograph, *supra* p. 299, before the curb-cuts were made or the areas were paved.) We find no violation of the restrictive covenant.

Counsel for Standard relies principally upon *Traylor v. Holloway*, 206 Va. 257, 142 S.E.2d 521 (1965), as authority for sustaining the injunction entered by the trial court in this suit. That case involved a restrictive covenant against the erection of any "building" except a single-family residence or private garage on any lot in a residential subdivision. Unlike the purposes of the restrictive covenants in this case, the purpose of the restrictive covenant in *Traylor* was to restrict the type of buildings that could be erected in a residential subdivision and the use to which the buildings could be put, with a view to the maintaining of property values in the subdivision.

The defendant Holloway erected a playhouse on his lot. Recognizing that the playhouse was clearly a "building" forbidden by the unambiguous language of the covenant, we ordered its removal. In this case the restrictive covenants do not specifically forbid what Goodwyn and the Bank have done and, interpreting these covenants strictly against Standard, we have found no intent to forbid what Goodwyn and the Bank have done.

Our order will reverse the decree, dissolve the injunction and dismiss Standard's bill of complaint.

*Reversed and final decree.*