## CIRCUIT COURT OF FAIRFAX COUNTY

Fairfax Square, L.L.C.

    v.

Hermes of Paris, Inc.

January 13, 2015

Case No. 2014-06509

By Judge John M. Tran

This matter came before the Court upon the Complaint for Declaratory Judgment and Permanent Injunction filed by the Plaintiff, Fairfax Square, L.L.C. ("Fairfax Square" or "Landlord") and a Counterclaim Complaint for Declaratory Judgment by Defendant, Hermes of Paris, Inc. ("Hermes" or "Tenant"). The Court writes this letter to explain its decision to award judgment in favor of Hermes.

### I. *Parties and Background*

Fairfax Square owns and operates a premium office and retail complex in the Tysons Corner area ("the Property" or "Fairfax Square"). The Property is located off Route 7 (Leesburg Pike) and positioned across the street from Tysons I, more commonly known as the Tysons Corner Center Mall, a highly regarded shopping mall in Northern Virginia. The Property is also located less than one mile from Tysons II, referred to as "Tysons Galleria Mall," another large shopping mall occupied by numerous distinctive retailers of luxury goods.

The Lease, or more specifically the Lease Addendum at issue here, was entered into on January 10, 1990, between Hermes and Fairfax Square Associates II, a Virginia General Partnership and the predecessor in interest to the Plaintiff. Fairfax Square, L.L.C., the Plaintiff in this action, assumed ownership and management of the Property in 1999.

The Property consists of three buildings (referred to as "Towers") placed in a U-shape configuration with two of the buildings (the end of the U) fronting the street upon which the Property sits with a third building set back. Tiffany & Co. occupies one of the front buildings (Tower 3). Hermes (and at one time, also Gucci) occupies the other building fronting the Property (Tower 2).

Hermes, an original tenant since the opening of Fairfax Square in 1990, is an internationally known iconic and easily recognized global brand that designs and sells a mix of luxury goods, including leather and silk purses, high-end accessories, and other household goods. It has been in business since 1837 and is considered one of the world's most exclusive designers and retailers of luxury goods.

Tiffany & Co. is an internationally known iconic and easily recognized global brand selling primarily jewelry and is also considered one of the world's most exclusive retailers of luxury goods.

There are eight retail spaces on the street level of the Property. Over the past twenty-four years, the tenants, owner, and property manager have changed. Tiffany and Hermes have remained.

On February 14, 2014, Hermes sent notice to Fairfax Square alleging that it had been in breach of its material covenant under the 1990 Lease Addendum since 2011. Under the Lease Addendum, there is to be a mix of retail tenants composed of quality retailers selling the highest quality goods and that are luxury tenants selling premium brands, such as Louis Vuitton, Gucci, and Fendi. Plaintiff's Exhibit # 6.

Paragraph 25 of the 1990 Lease Addendum provides, in pertinent parts, that:

> Landlord covenants to Tenant that it will operate the retail and office portion of the Property as a premium office and retail center. *It is a material covenant on the part of the Landlord that the mix of tenants in the retail section of the Property shall be composed of quality retail establishments which sell the highest quality good and which are "luxury" tenants selling premium brands, such as by way of example, Tiffany's [sic], Fendi, and Gucci, and shall operate their establishments in a manner in which suggests the highest quality for their type of operation.* High quality service businesses such as banks are also permitted.

> If Landlord is in violation of any covenant, in this Paragraph, then continued violation of this covenant for 90 days after written notice of such violation from Tenant to Landlord without limiting Tenant's other rights against Landlord shall entitle Tenant to terminate this Lease without further costs or obligations of any tenant to Landlord. Tenant need not choose between such right of termination and its other rights, but may exercise one or more of them jointly.

Plaintiff's Exhibit # 2 (emphasis added). Plaintiff's Exhibit # 2, The contract between the parties consist of the following: Lease dated January 10, 1990 (PTX # 1); Lease Addendum dated January 10, 1990 (PTX # 2); Second Addendum to Lease (PTX # 3); Third Addendum to Lease (PTX # 4); and Lease Extension Agreement dated September 29, 2004. (PTX # 5.) The contested provision regarding the "mix" of tenants under paragraph # 25 of the Lease Addendum dated January 10, 1990, remained unchanged through subsequent addenda to the Lease.

The Landlord complained that the February 14, 2014, notice was inadequate to appraise it of the basis for the purported breach of the Lease. The Court finds that the February 21, 2014, letter sent by Thomas Roth, counsel to Vornado, Charles E. Smith, responding to the February 14, 2014, notice on behalf of the Landlord, clearly defined the issues that went to trial. At the time of trial, the issues had been clearly defined as (1) whether the existing vacant retail spaces in February 2014, although leased and in the process of being built for incoming tenants, constituted a breach of ¶ 25 and (2) whether the tenants in place met the requirement under ¶ 25 that the mix of tenants in the retail section of the Property be composed of "quality retail establishments which sell the highest quality good and which are `luxury' tenants selling premium brands, such as by way of example, Tiffany's [sic], Fendi, and Gucci."

By the summer of 2014 and ninety days after the February 2014 notice, all but one of the eight retail spaces were leased and occupied. The eight tenants included USAA bank and Miele in Tower 1, Elizabeth Arden Red Door Salon, a vacant space, Hermes, and Liljenquist & Beckstead in Tower 2, and Tiffany & Co. and Chef Geoff's in Tower 3.

The new tenants who arrived in 2014 included a bank branch of USAA, Miele, an internationally known luxury and upscale appliance retailer, and Liljenquist & Beckstead, a well-known local jeweler that sells luxury goods and internationally known luxury brands such as Rolex watches.

Fairfax Square contends that the mix of retailers would satisfy the definition of luxury tenants under ¶ 25 of the 1990 Lease Addendum. On May 13, 2014, it filed a four count Complaint for declaratory judgment, permanent injunction, and attorney's fees. The Complaint sought to enjoin Hermes, as one of the two bookend tenants, from terminating its lease, which is otherwise set to expire in 2020.

On June 4, 2014, Defendant Hermes filed a Counterclaim in addition to answering the Complaint. Defendant sought a declaration that Fairfax Square was in breach of the material covenant under paragraph 25 of the Lease Addendum and asked for attorney's fees.

At the conclusion of the Plaintiff's case, the Court sustained a motion to strike Count II of the Plaintiff's Complaint for Declaratory Relief and that part of Count III of the Complaint seeking injunctive relief.

Count II pleaded that the February 14, 2014, complaint was deficient. After taking the evidence in the light most favorable to Fairfax Square, the Court finds that the complaint sufficiently placed the Landlord on notice of the applicable material covenant at issue.

Notably, a week after the February 14, 2014, letter was issued, the Landlord responded with a letter, dated February 21, 2014, which framed the very issues upon which this Court ultimately decided. To suggest that the notice had to contain greater details or be in any other form would impose requirements not present under the Lease or applicable law.

With regards to Fairfax Square's request for injunctive relief, evidence came to light that Hermes had decided not to vacate the premises and continued to fully meet its lease obligations while awaiting the outcome of the trial. Fairfax Square did not present credible evidence that it would be irreparably harmed in the light of Hermes' willingness to await the outcome of trial, and the Court finds at the conclusion of the evidence that, even if Hermes left in breach of its Lease obligations, there is no evidence of irreparable injury due to the present configuration of existing tenants.

Prior to trial, Fairfax Square took a nonsuit of Count IV of its Complaint seeking money damages for its incurred attorney's fees. What, therefore, remained for the Court's decision were the competing complaints for declaratory relief. On the Landlord's side, there remained Count I that sought a declaration that the Landlord was not in breach of the lease and especially with respect to the material covenant under ¶ 25 and the portion of Count III that sought a declaration the Landlord would be irreparably harmed should Hermes be allowed to terminate the Lease under ¶ 25. (The declaratory judgment counts further asked for attorney's fees — discussed below in the "Miscellaneous" section of this letter.)

Hermes filed a single count counterclaim seeking a declaration that the Landlord was in violation of a material covenant under the Lease because the mix of retail tenants did not meet the requirements under ¶ 25. Hermes also asked for attorney's fees.

A complaint (or counterclaim) for declaratory relief under Va. Code § 8.01-184 is an appropriate method for resolving controversies over the interpretation and application of any written instrument, including a commercial lease. A declaratory judgment action can be brought to determine whether the continuing occupancy or condition of a property governed by a lease may or may not subject a party to future liability without requiring

an actual invasion of rights by a party before such determinations can be made. *See Hop-In Food Stores, Inc. v. Serv-N-Save, Inc.*, 237 Va. 206, 375 S.E.2d 753 (1989).

Under, Va. Code § 8.01-191, declaratory judgment actions are remedial and the purpose of the proceeding is to allow relief from uncertainty without requiring an actual invasion of rights and make the courts more serviceable to the people.

## II. *Findings of Facts and Conclusions of Law*

A. *A plain reading of the examples the parties identified to be a part of the appropriate mix of high-end retailers of luxury goods supports Hermes' complaint that, as of 2014 and except for Tiffany and Hermes, no other retailer met that definition.*

This case, involving the disputed interpretation of a lease provision, is a contract case. The Court begins its consideration, as it does in every contract claim, by looking at the words at issue within the four corners of the agreement itself, and attempting to interpret them in accordance with their usual, ordinary, and popular meaning. *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 561 S.E.2d 663 (2002); *Haisfield v. Lape*, 264 Va. 632, 570 S.E.2d 794 (2002).

The lodestar for discerning the intent of the parties is the purpose for which the parties entered into the contract. Not only must the Court consider the words as plainly stated, but it also has to consider the entirety of the written agreement between the parties and interpret the words' use in light of their stated object and purpose as is clear by the subject matter, condition, and situation of the parties. *Reid v. Boyle*, 259 Va, 356, 367, 527 S.E.2d 137, 143 (2000); *Carpenter v. Town of Gate City*, 185 Va. 734, 740, 40 S.E.2d 268, 271 (1946).

The Landlord takes the position that ¶ 25 of the Lease Addendum is unambiguous. Although Hermes did not concede this issue during its closing argument, the Court concludes, upon further consideration of Hermes' trial brief and its counterclaim, that Hermes has asserted that the provision is unambiguous. Generally, a party is estopped from taking a position that is contrary to one it has advanced throughout the trial.

A plain reading of the ¶ 25 requires the Court to examine the surrounding tenants on the Property to determine whether there was the mix of "luxury" tenants selling premium brands, such as by way of example, Tiffany, Fendi, and Gucci.

As of 2014, Fendi and Gucci had left, and the only remaining tenant was Tiffany. If the mix were defined by these three entities, the inquiry would stop there, as Fendi and Gucci are no longer present and Tiffany was the only remaining luxury brand tenant. There would be no mix as required under the Lease Addendum.

However, the provision reads to include other future tenants. As applied in the future to new tenants, and persuasively argued by Hermes, the rule of *ejusdem generis* limits the type of tenants that meet the definition and provides that:

> when a particular class of persons or things is enumerated in a statute (or writing) and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words.

Also, applying the doctrine of *noscitur a sociis*, this Court reads the words in harmony with their context, *Turner v. Commonwealth*, 226 Va. 456, 480, 309 S.E.2d 337 (1983), and gives meaning to the inclusion of the three businesses expressly identified under ¶ 25.

The Court finds that the drafters' specific reference that limited the suitable tenants, by example, to the three named entities is consistent with efforts to maintain more than a premium retail space, but one that is as exclusive as luxury demands. In applying the principle of *ejusdem generis*, the reference to iconic brands such as Tiffany & Co., Fendi, and Gucci is sufficient to identify the class of retail tenants that have to meet the common characteristics of those three companies and not merely the goods they sell.

This interpretation is made under the Court's construction of ¶ 25 as a restrictive covenant.

Hermes disputed characterizing the provision as restrictive by asserting that ¶ 25 is not subject to a claim for specific performance and should not be considered a restrictive covenant. However, Section 8.5 of the 1990 Lease affords Hermes the opportunity to seek specific performance of any covenant under the Lease, including the Lease Addendum. It is consistent with the purpose of the Lease if Hermes was empowered to prevent the leasing of space next to it by a store that would diminish the iconic Hermes brand. Therefore, the Court accepts the standard imposed on the interpretation of restrictive covenants and finds that Hermes has the burden of proof to establish the restrictive covenant and its breach.

As stated in *Scott v. Walker*, 274 Va. 209, 212-13, 645 S.E.2d 278, 280 (2007):

> It is . . . the general rule that while courts of equity will enforce restrictive covenants where the intention of the parties is clear and the restrictions are reasonable, they are not favored, and the burden is on him who would enforce such covenants to establish that the activity objected to is within their terms. They are to be construed most strictly against the grantor and persons seeking to enforce them, and substantial doubt or ambiguity is to be resolved in favor of the free use of property and against restriction.

(Citations omitted.)

Such restrictive covenants can be found in commercial leases as well. *State-Planters Bank v. Standard Cary Corp.*, 208 Va. 298, 156, S.E.2d 778 (1967). However, if the plain meaning of the covenant is manifest from the words chosen, a court must accord express meaning to the covenant. *Whitehurst v. Burgess*, 130 Va. 672, 577, 107 S.E.630 (1921); *Elterich v. Leicht Real Estate Co.*, 130 Va. 224, 239, 107 S.E. 735 (1921).

**B.** *The contract terms are latently ambiguous and required the Court to consider parol evidence to define the governing terms.*

Contrary to the position taken by the parties, the Court finds that, upon a closer reading, the application of the ordinary meaning of the words to the facts of this case begin to unravel as a number of ambiguities arise because of the difference between the facts that exist today and the facts that existed when the contract was first entered into — nearly twenty-four years ago.

The controlling sentence under the lease is repeated as follows:

> It is a material covenant on the part of the Landlord that the mix of tenants in the retail section of the Properly shall be composed of quality retail establishments which sell the highest quality good and which are "luxury" tenants selling premium brands, such as by way of example, Tiffany's [sic], Fendi, and Gucci.

That provision can be broken down into various areas of inquiry. In deciding this case, the Court had to interpret:

(1) What constitutes a mix?

(2) What constitutes "luxury" tenants?

(3) Whether "quality retail establishments which sell the highest quality good" were the equivalent of or a group distinct and separate from "luxury" tenants?

(4) What constitutes " 'luxury' tenants selling premium brands, such as by way of example, Tiffany, Fendi, and Gucci" and whether the descriptive words of "Tiffany, Fendi, and Gucci" modify the word "brand" or the word "tenants"?

An ambiguity exists when the contract language is susceptible of being understood several ways. *Pocahontas Mining, L.L.C. v. CNX Gas Co.*, 276 Va. 346, 352-53, 666 S.E.2d 527 (2009). It became evident that the provision contained a latent ambiguity and not simply because the two parties disagreed on the interpretation of those words and defined them to their respective advantage.

After examining the purpose of the contract and its surrounding provisions, the Court finds a need to admit parol evidence to explain what "Tiffany, Fendi, and Gucci" means for purposes of interpreting the covenant. In fact, strangers to the luxury market may not even recognize these iconic brands.

Parol evidence is inadmissible to explain either an unambiguous or patently ambiguous document, where an ambiguity arises from language that appear on its fact to be unambiguous, but is later proved to be unclear because of subsequently developed facts. *VEPCO v. Norfolk S. Ry.*, 278 Va. 444, 460, 683 S.E.2d 517, 526 (2009); *Galloway Corp. v. S. B. Ballard Constr.*, 250 Va. 493, 503, 464 S.E.2d 349, 355 (1995). Where parol evidence is admissible, the Court may discern the parties' intent from the extrinsic evidence.

The rule of parol evidence is as applicable to the interpretation of leases as with any other written contract. *See Clyborne v. McNeil*, 201 Va, 765, 770, 113 S.E.2d 672, 676 (1960) (declaratory judgment action concerning a lease for the mining of land).

C. *The "mix" of tenants in this case requires at least three tenants when including Tiffany and Hermes. In other words, if Tiffany and Hermes were then operating, then to result in the "mix," a third "luxury" tenant must be added to the retail space.*

The first word the Court had to define was the word "mix." "Mix" is commonly used as a verb and defined as:

> to combine (two or more things) to make one thing that is the same throughout: to combine (two or more substances) to make a different substance: to add (something) to something else: to be combined and become one thing that is the same throughout.

*Merriam-Webster*, Mix — Definition, http://www.merriam-webster.com/ dictionary/mix (last visited January 13, 2015).

As a noun, "mix" is defined as:

> a dry mixture of ingredients that is sold in one package and used for making something (such as a type of food): a combination of different kinds of things

*Id.*

When a verb is used with an object, it is defined as follows:

> To combine (substances, elements, things, etc.) into one mass, collection, or assemblage, generally with a thorough blending of the constituents.

Dictionary.com, Mix, http:// dictionary.reference.com/browse/ mix (last visited January 13, 2015).

The Court finds credible Hermes' testimony that it needed to be placed among a necessary "cluster" of like-minded stores. What was less clear was

what constituted the minimum number of such stores, assuming all other factors are equal, and whether Tiffany and Hermes alone could satisfy the mix under the Lease.

The Court did not interpret "mix" to mean "all," and so that number had to be no fewer than two and not necessarily all.

And the Court accepts the argument that the ultimate minimum number is dependent on the quality of tenants as a whole. For example, even if the number were as great as they were in 1999, the Court finds that it is inconsistent with the purpose of the covenant if the other surrounding tenants were no-brand, discount, or shops of questionable character. It can be as little as three or four depending on the presence of what the Court came to learn as "aspirational-luxury" stores.

The Court found itself having to define what number constituted the "mix" by looking at the "cotenancy provision" under ¶ 24 of the 1990 Lease Addendum. A cotenancy provision under a commercial lease differs from the standard definition of a co-tenant. The "cotenancy" referred to by the parties in this case is understood as:

> A common clause in retail lease contracts that allows tenants to get a reduction in rent from landlords if key tenants or a certain number of tenants leave the space. A large or key tenant is a big draw for traffic, especially in malls, and are often one of the major reasons a tenant chooses to locate in a specific mall. A co-tenancy clause provides the tenant with some form of protection in the form of reduced rent to compensate for loss of traffic.

Investopedia, Co-Tenancy Clause, http:// www.investopedia.com/ terms/c/ co-tenancy-clause.asp (last visited January 13, 2015).

Here, the original 1990 cotenancy remedy was more than a reduction in rent. Under ¶ 24, the Lease itself was conditional upon the expressed presence of Fendi (USA), Inc. (or a Fendi licensee) or Gucci America, Inc., and the opening of Tiffany & Co within twelve months after Hermes opened for business.

Plainly read, ¶ 24 identified two independent and separately dispositive conditions where certain businesses had to be operating under a lease for at least ten years for the Hermes' Lease to remain operative. The first condition relates to Fendi or Gucci. The second condition relates to Tiffany & Co. From the outset of the lease, the parties contemplated the presence of a minimum of three entities for a period of ten years. The illustration of acceptable stores under ¶ 25, the contested provision, expressly identifies three stores in addition to Hermes.

Additionally, in ¶ 21 of the May 16, 1989, proposal, Plaintiff's Exhibit # 19, the parties identified as a condition to the Hermes' lease being operative the signing of leases by Tiffany and Fendi. The parties have never said in their correspondence that two was sufficient, and they discussed a mix of

at least three. Consequently, this is how the Court also interpreted the word "mix," e.g., as a mix of three or more luxury tenants stores such as Tiffany, Fendi, and Gucci.

The mere fact that certain spaces were vacant at any given point in time does not constitute a breach of ¶ 25. The applicable provision construed strictly in favor of the Landlord to support the position that an unoccupied space alone would not constitute a default can be found under the Second Addendum to the Lease, dated May 10, 1991 under which the parties added to ¶ 25 the provision that:

> It shall not be a violation of this covenant (¶ 25) if any of the other Tenants in the Property are not open as a result of an event beyond its control, alternations actually made in good faith and in due diligence, a holiday, or the taking of inventory.

While Hermes argues in its trial brief that this refers to tenants who were operating in their space before vacating the space, the provision does not limit the exclusion from that limited list. The Court finds that to read ¶ 25 to meet the purpose of the parties, if the Landlord has entered into a lease with a tenant, who then is building out the vacated space to occupy it, the period of construction falls under this paragraph.

If the term "Tenant" is defined to include parties who have entered into leases, but not yet entered the spaces, then the ninety-day period during which the Landlord can cure a violation of ¶ 25 becomes reasonable, although potentially difficult to meet.

D. *The term "luxury" tenant meant iconic international designers of luxury goods associated with the fashion world, such as Tiffany, Fendi, and Gucci.*

Under ¶ 25 of the Lease Addendum, the Landlord had agreed to a material covenant that there be a mix of quality retail tenants selling premium brands and referenced those tenants as "luxury tenants" selling premium brands, such as by way of example, Tiffany, Fendi, and Gucci. If the example of Tiffany, Fendi, and Gucci were plainly applied to the facts, none of the other tenants in 2014, with the exception of Tiffany & Co., met the definition of Tiffany, Fendi, and Gucci.

Fairfax Square placed no importance on the fact that the term "luxury" was placed next to tenant. For the Landlord, that word was simply an expansion of the preceding sentence identifying quality retail tenants selling the highest quality goods.

However, this Court must construe every term under a contract as having some importance. "No word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it, and there is a presumption that the contracting parties have not used words needlessly." *Pocahontas Mining, L.L.C.*, 276 Va. at 353. The parties used "luxury" for a reason.

Those three stores identified as examples of "luxury" tenants share certain common characteristics that are uncommon to the general class of retailers that sell luxury goods. They are all internationally iconic designers and sellers of their own brands, and they are not appliance stores or primarily a high end service business. If the drafters of the contract intended to simply refer to all retailers of luxury brands, there would be no need to add the examples provided.

In order to search out the meaning of "luxury tenants," the Court reviewed the various provisions of the 1990 Lease Addendum.

The Court considered ¶ 19 of the Lease Addendum and how that provision allowed Hermes to change the use of the space from a Hermes store to another store that focused predominantly on the retail sale of luxury goods consistent with ¶ 25, with the specific exclusion that the change could not be used for a service business, such as a banking, insurance, brokerage, or restaurant business.

The Landlord argues that ¶ 19 corroborates with its position that it is not the nature of the tenant that matters, but rather the goods that it sells and the manner in which the business is operated that controls and that a different definition would vest Hermes with greater rights than the Landlord.

The Court also considered ¶ 20 of the Lease Addendum, which allowed Hermes to assign or sublet its space after the third year to third parties that operate retail stores conforming to the high quality parameters outlined under ¶ 25. The Court considered ¶ 22(b), where "Luxury Retail" Tenants were defined as those selling primarily luxury goods, excluding restaurants and retail services such as banking.

While those provisions do not define "luxury retail" tenants as being limited to the iconic businesses named above, the Courts finds that "luxury" tenants and the reference to the examples, such as Tiffany, Fendi, or Gucci, meant something specific. Consequently, the Court interprets "quality retail establishments which sell the highest quality of good" *and* "luxury tenants selling premium brands" to refer to the tenant itself and not simply the brand when comparing other entities to Tiffany, Fendi, and Gucci.

This definition is consistent with the language found under the May 16, 1999, proposal. (PTX # 19.) According to ¶ 22 of the written proposal leading up to the execution of the Lease:

> The Lease shall specifically provide that it is a material covenant on the part of the Landlord that the mix of tenants in Fairfax Square be composed of quality retail establishments which sell the highest quality goods and which are "luxury" tenants selling premium brands, such as by the way of example, *tenants* such as Fendi and Gucci.

(Emphasis added.)

It appears that, when the language of the proposal was copied over to the 1990 Lease, Tiffany was added as an example of a "luxury" tenant and the word "tenants" itself was dropped from the introductory phrase leading up to the examples.

The omission of the word "tenants" from the Lease Addendum did not render meaningless the named "examples." The Court instead interprets the placement of "luxury" next to "tenants" as meaning that it is not simply tenants selling premium brands who must be in the mix of tenants, but tenants that are themselves "luxury" tenants, such as by way of example Tiffany & Co., Fendi, and Gucci. The shared characteristics of each of the three luxury tenants under ¶ 25 are that they are iconic and easily recognized global brands that design and sell a mix of luxury goods and more importantly they sell their own brands and are not appliance companies.

Consequently, the Court does not accept the Landlord's interpretation of the phrase "quality retail establishments which sell the highest quality goods" as independently sufficient to allow the mix of tenants to include regional retailers that do not design and sell their own products, but sell brands belonging to others.

The position that Hermes adopted in this case is consistent with the Tenant Estoppel Certificate that it executed on September 11, 2009. (PTX # 22.) As of September 2009, the stores that met Hermes' definition under ¶ 25 were: Tiffany, Hermes, Louis Vuitton, and Gucci. Five of the eight retail spaces were occupied by iconic globally branded stores and not merely stores that sell those brands.

Hermes' complaint as to Miele is valid. While Miele is an internationally known and recognized global brand, it sells high end appliances — far outside the categories of goods sold by Hermes and the three entities identified as suitable tenants. The Court finds that an appliance, no matter how costly, is not equivalent to the products sold by Tiffany, Fendi, Gucci, or Hermes.

The application of *ejusdem generis* excludes Liljenquist & Beckstead. The Court accepts that Liljenquist & Beckstead is an outstanding local jewelry store and that its $2 million investment in designing and constructing its Barry Dixon designed store has created a stunning space. However, the jewelry store itself is not Tiffany, Fendi, or Gucci.

Another fact that aided the Court's interpretation is Tiffany's cotenancy provision, admitted into evidence by the Landlord under Tiffany's lease. Tiffany's cotenancy provision is remarkably more expansive than ¶ 25 under the Hermes agreement. For example, Tiffany defined acceptable "high end retail tenants" to include Tiffany, Fendi, Hermes, Louis Vuitton, Gucci, Morton's of Chicago, Primi Piati, Priscilla of Boston, Elizabeth Arden, and Parvizian. (PTX 88 at ¶ 47.) Therefore, expressly included in the Tiffany's definition, but expressly omitted from the Hermes' definition, are the local, regional, or national high end retail tenants, engaged in a variety of retail of

luxury goods and services to include rugs, food, and make-up. The "mix" of tenants permitted in Tiffany's' lease is more inclusive of other kinds of stores than Hermes'.

Both Miele and Liljenquist & Beckstead fit the type of tenants allowed within Tiffany's cotenancy provision. Meanwhile, none of the other leases contain a cotenancy requirement that Hermes remain on site, including the Red Door Salon Lease (PTX # 90, 91, 92) and the USAA lease. (PTX 99.)

In fact, the new leases expressly remove the cotenancy requirements. Under ¶ 31 of both the Liljenquist & Beckstead and Miele leases, the tenants agreed that "Tenant does not rely on the factor, nor does Landlord represent, that any specific tenant or occupant or number of tenants or occupants shall during the Lease Term occupy any space in the Building."

These facts alone are sufficient to reject any claims of irreparable injury.

The Court finds that the Lease between CityCenterDC and Hermes (PTX 147) is instructive on Hermes' interpretation of what it defines as necessary co-tenants. Under ¶ 2.09(e), Hermes, apparently having learned its lesson of not having greater control over the selection of its neighbors, required their new Landlord to work with Hermes to reach an accord as to replacement tenants. The list of tenants at the CityCenterDC space is consistent with ¶ 25's identification of Tiffany, Fendi, and Gucci as acceptable tenants

Throughout this trial, the Landlord unconvincingly argued that Hermes did not actually have a sincere desire to move, but that it had manufactured a complaint over the quality of the other tenants in order to obtain leverage in renegotiating its rental terms.

Notably, and inconsistent with this argument, the Landlord admitted into evidence exhibits that confirmed decisions made by the corporate head office in Paris to authorize a move of the Hermes store from Fairfax to the CityCenter in the District of Columbia.

In reviewing the notice of February 14, 2014, the internal communications, and the demeanor of the Hermes witnesses, the Court finds the evidence is incontrovertible that Hermes had decided to relocate to the District of Columbia at its earliest opportunity to join a location where the appropriate mix of upscale luxury tenants were present because such a mix does not exist at the Property.

## E. *Miscellaneous Issues*

With reference to Plaintiff's request for injunctive relief, the Court has granted the motion to strike that part of the Complaint, but further notes that, pursuant to Va. Code § 8.01-189, "the pendency of any action at law or suit in equity brought merely to obtain a declaration of rights or a determination of a question of construction shall not be sufficient grounds for the granting of any injunction."

As referenced above, the evidence admitted at trial resolved any doubts that injunctive relief was unavailable to the Landlord. The Hermes lease

ended in 2020 at best. While there is case law from other jurisdictions that supports the claim that the Hermes lease provided for continuous operation and percentage rent and can, therefore, give rise to irreparable injury, *see Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 164 A.2d 785, 791, (N.J. Super. Ct, 1960), the departure of Hermes does not rise to a level of irreparable injury in this case.

The facts here are fundamentally different from the case of *Massachusetts Mutual Life Ins. Co. v. Associated Dry Good Corp.*, 786 F. Supp. 1403 (N.D. Ind. 1992). In *Massachusetts Mutual Life*, the tenant, an upscale anchor department store situated in the middle of a mall that had been declining in revenues, occupied a substantial amount of the rentable space and was found by the District Court as having a presence, the value of which was unquantifiable. In that case, the facts may have been sufficient to grant a preliminary injunction.

The facts here would not have been sufficient to sustain a preliminary injunction. In this case, the Property has a total of 42,374 square feet of space. According to the demonstrative evidence, seven of the spaces were rented and a total of 40,092 sqaure feet of space were occupied. This results in a current 94% occupancy rate. If Hermes left, the occupancy rate would drop to 35,792 spaces or an 84% occupancy rate. The difference of 10% is immaterial, especially when considering that before Miele, Liljenquist & Beckstead, and USAA moved in, the vacancy rate was at 64% for an extended period of time.

Although Hermes is the other original bookend tenant, Liljenquist & Beckstead is now prominently on that same side. There is none of the adverse loss of traffic and other incidental damages that would flow from Hermes' departure that existed in the *Massachusetts Mutual Life Ins.* case.

The very reason Fairfax Square advances that it would be irreparably harmed if Hermes left the Property, is the reason Hermes wants to leave, and that is concern over the value of the Hermes brand.

The Landlord cannot credibly claim that high end retailers, such as Miele and Liljenquist & Beckstead can maintain the mix of high end retailers and also claim that the departure of Hermes would result in irreparable injury.

Hermes' departure leaves one space vacant on the other side of Tower II fronting the Property. Prior to Hermes' departure, one half of that side, previously occupied by Gucci, stood vacant.

While it is evident that the other tenants would be unhappy if Hermes left, the credible evidence is that Hermes did not reciprocate in its valuation of its new neighbors. The purpose of ¶ 25 was to protect Hermes and no other tenant. Even Tiffany's lease is not dependent on Hermes remaining. No provision in any lease expressly identifies Tiffany or Hermes as necessary "anchor" tenants, whose departure would result in the breach of another lease.

During trial, the Landlord unsuccessfully attempted to explore the profitability of the Hermes store on the Property. While the Court ruled that such evidence was irrelevant for use as suggested by the Landlord, such evidence would have been relevant to the argument that the move was not a pretext and that it was so important to Hermes to be in proximity to luxury tenants with the same provenance that Hermes enjoys that it was willing to risk leaving a proven profitable location to move to an untested location.

Ultimately such evidence would have been cumulative. From the documents admitted into evidence to the credible testimony provided by Hermes' witnesses, Robert Chavez and Stephen Wentz, the Court found that Hermes' desire to be among a group of luxury tenants rather than stand alone with Tiffany & Co. was genuine and not pretextual.

With respect to the issue of legal fees, the Court finds that, under the Lease and applicable legal authority, the Landlord cannot reserve and claim legal fees arising from this action.

This matter came before the Court to construe ¶ 25 of the Lease Addendum. The Landlord argues that, under ¶ 5.1.12, it can reserve for a later date the opportunity to bill the tenant for the legal fees and costs it incurred without having to first establish the reasonableness of the fees. ¶ 5.1.12 allows the landlord to include in a rent invoice its reasonable attorney's fees incurred in enforcing an obligation of the tenant.

It would be inconsistent not to read the requirement of a prevailing party into this provision. More importantly, it is incumbent upon the Landlord to establish the reasonableness of its fees. The most appropriate forum for that determination is in the underlying action that gave rise to the incurrence of the fees. This Court, having sat through a three-day trial contesting the construction of Lease provisions, is better situated to consider the reasonableness of fees contemporaneously with the closing of evidence than another court whenever the Landlord may decide to bill those fees.

In 2006, the Virginia Supreme Court adopted Rule 1:6 and made it applicable to all cases filed after 2006. This Rule requires all claims arising from a transaction be brought once it comes to court seeking relief. Here, the Landlord sought a declaration that it was not in breach of a material covenant and asked for recovery of fees. As part of its claims, the Landlord needed to resolve if it was entitled to attorney's fees and what sum was reasonable if it were the prevailing party.

The Court, upon motion of any party, or upon its own motion, may, in advance of trial, establish a procedure to adjudicate any claim for attorney's fees. Va. Sup. Ct. Rule 3:25(D). If no party requests such procedure, then claims for attorney's fees must be pursued in the underlying action in the Plaintiff's case in chief. *Lee v. Mulford*, 269 Va. 562, 567-68, 611 S.E.2d 349, 352 (2005).

Plaintiff cannot adopt a litigation strategy that allows it to reserve for another day the reasonableness of the fees associated with this action, and

the Court finds that the claim for attorney's fees arising out of the parties' dispute over ¶ 25 of the Lease Addendum, if not pursued, is precluded from further litigation.

In any event, under Va. Code § 8.01-190, the costs of such suit may be awarded to the prevailing party, and Hermes, not Fairfax Square, is the prevailing party in this dispute.

### III. *Conclusion*

The Court finds and declares in response to Court I of the Complaint that Fairfax Square is in default of the material covenant under ¶ 25 of the 1990 Lease Addendum and that it is not entitled to attorney's fees.

The Court finds and declares in response to Count III of the Complaint that Fairfax Square is in default of the material covenant under ¶ 25 of the 1990 Lease Addendum and that the circumstances of the parties in this case do not warrant the imposition of an injunction.

The Court finds and declares in response to the Counterclaim that the material covenant under ¶ 25 had been breached and left uncured since February 14, 2014.

The Court finds and declares that Hermes is entitled to terminate the Lease without further obligation to the Landlord. However, in the exercise of its attendant equitable powers and recognizing the need to preserve the commercial reputation of both parties, the Court declares that Hermes should exercise its rights with the same sixty-day notice it provided in June 2013 and continue to pay its rent accordingly, and not under the holdover provision of the Lease. The parties are free to mutually agree upon any post-termination procedure, including mutually agreeing to modify this sixty-day notice requirement.

The Court finds that, under Va. Code § 8.01-190, the positions of the parties are such that it would have awarded Hermes its reasonable attorneys' fees. However, the Virginia Supreme Court, in *Russell County v. O'Quinn*, 259 Va. 139, 142, 523 S.E.2d 492, 493 (2000), held that only costs are allowed.

The Court awards Hermes its costs to include the usual taxed court costs (Va. Code § 17.1-600 *et seq.*) and costs allowed under equity, but not including attorney's fees, fees paid to the court clerk for filing the lawsuit (or counterclaim), fees paid for serving a summons or notice to Plaintiff, fees paid for serving subpoenas on witnesses, mileage costs for witnesses, costs of court transcripts, and costs for copying papers and exhibits.

In anticipation of the Plaintiff's potential desire to pursue an appeal, the Court informs counsel that it is based upon the Court's finding of the lack of evidence of irreparable harm to the Landlord that it will not enjoin Hermes from moving during the pendency of the appeal, but, if shown to be necessary, the Court will consider a request for an appeal bond for a period of no longer than sixty days to allow for an emergency appeal of the Court's denial of an injunction pending appeal, and, if such an appeal bond

422

is within the authority of the Court and for good cause shown, the Plaintiff will have to file a motion seeking such an appeal bond for the Court to consider this request.